REVOCATION OF APPOINTMENT OF A GUARDIAN OF A
MINOR SURRENDERED FOR ADOPTION.

Worcester. June 2, 1971. — June 30, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, SPIEGEL, REARDON, QUIRICO,
& BRAUCHER, JJ.

*Adoption. Parent and Child. Probate Court,* Parties. *Guardian,* Of
minor.

The Division of Child Guardianship in the Department of Public
Welfare, to which a mother surrendered her minor child for the
purpose of adoption, had standing to appeal from a decree of a
Probate Court dismissing the Division's petition to vacate a decree
granting guardianship of the child to its mother. [85–86]
Following written consent by a mother to the surrender of her minor
child to the Division of Child Guardianship in the Department of
Public Welfare for the purpose of adoption and custody of the child
taken by the Division, it was improper for a Probate Court to allow
a petition by the mother for her appointment as guardian of the
child until her consent to the surrender had been set aside as
involuntary. [86]
Reported evidence in a proceeding in a Probate Court required a
decision that an unmarried mother about twenty years of age
could not properly revoke her surrender of her minor child to the
Division of Child Guardianship in the Department of Public
Welfare and her consent to adoption of the child where there was
persuasive testimony of the painstaking explanations by the
Division to the mother prior to the child's birth of the several
possibilities for its care and the procedures involved, of the
mother's consideration of the problem and the possible alterna-
tives over a period of weeks, of her decision at least a month before
the birth of her child to resort to adoption, of the solicitude of the
Division to see that the mother was acting in a voluntary manner,
and of the care exercised by it concerning execution of the consent
papers [86–88]; comparing the benefits and detriments to the child
of raising it in the home of its mother and its mother's parents,
with whom her mother had formerly encountered a lack of
understanding, and of raising the child in the home of its adoptive
parents, who took the child shortly after birth and had tended it
with care and affection for a substantial time, a conclusion was
required that in the best interest of the child its mother's
surrender and consent to adoption should not be revoked. [88–89]

PETITION filed in the Probate Court for the county of Worcester on February 20, 1970, to vacate a decree of guardianship.

The case was heard by *Wahlstrom, J.*

The case was submitted on briefs.

*Joseph Donoghue* for the respondent.

*John J. O'Shaughnessy* for the petitioner.

CUTTER, J. The petitioner (the mother) was an unmarried woman, twenty years old at the time of her child's birth in October, 1969. She had lived with her parents (a police officer and his wife) in New Hampshire, until it was discovered that she was pregnant. Then, because she and her parents "weren't speaking together," she left home to live with her sister, also in New Hampshire. She made a settlement for $500 with the man responsible for her condition, the same attorney representing her and the man. That money ran out. Because the sister could not support them both, the mother moved to live with a cousin, a woman residing in Massachusetts. The mother was living at her cousin's residence when the child was born.

The mother, sometimes at least with her cousin, had several conferences or telephone talks with at least three representatives of the Commonwealth's Division of Child Guardianship in the Department of Public Welfare (the division). Representatives of the division made full explanation to the mother of several possibilities for the care of the expected child, e.g. (a) by welfare aid to the mother, (b) by temporary care in a foster home, or (c) by surrender for adoption. After consideration, the mother decided (1) that welfare aid would be insufficient, and that she ought not to subject her child to life without a father; (2) that she would not consent to placing the child in a foster home; and (3) that she wished to resort to direct adoptive placement. The social worker (in charge of discussions with the mother) then made inquiries of her supervisor in the division about the possibility of a direct placement for adoption. The procedure was explained fully to the mother. About a month before the child's birth, the social worker visited

the mother at the cousin's house "to check with her once again to make sure she was certain about her decision to release her child." A referral to the division's adoption placement unit in Boston was then made.

The mother left the hospital on the day after the baby was born. She was in a hurry to get back to New Hampshire but spoke by telephone to the division's social worker and the supervisor, and was told that, "as far as a direct placement was involved, it was very vital that she sign . . . releases [of the child], if she still wanted to do so . . . otherwise the child couldn't leave the hospital and be placed in an adoptive home, unless . . . [the division] had these adoption releases in . . . [its] possession." The mother, accompanied by her sister, went to the division's office. She signed a release and acknowledged it before a notary public, after she had "seemed to" read it.

The child, on October 16, 1969, within three days after its birth, was placed in the home of a childless married couple who had been studied and interviewed by Mrs. Rotman, supervisor of social service employed by the division in its adoption unit, and by others. The prospective adoptive mother had formerly been employed and was then thirty-one years old. The prospective adoptive father was thirty-five years old. He was engaged in technical work, had an income of $12,000 a year, and was studying for a doctor's degree. The couple had been married seven years. The child, so far as this record shows, has been with the couple since October, 1969, and at the time of trial (February 20, 1970) was a normal, healthy, happy baby. A social worker from the adoption unit had seen the child three times between his placement in October, 1969, and December, 29, 1969, but had not had opportunity (in the first fifty days of 1970) to make later observations.

After the birth of the child, the mother returned to her own parents in about two weeks. She and her parents became reconciled. Both parents "realized" that they had "made a great mistake about not actually solving . . . [the mother's] problem when she had one." They are now

"closer than ever" before. The parents are prepared to take in the mother and her child. The parents' income is about $800 a month. They have a child who was about six years old in 1970.

On January 11, 1970, the mother called the division's social worker and "indicated that she wanted her child back." She represented that, when "she signed the releases, she had been married to . . . the alleged father." This representation the mother, at trial, admitted was not true. She retained counsel and on January 26, 1970, filed a petition in the Probate Court for her appointment as guardian of the child. The record contains no indication that any notice of this petition (prior to its allowance) was given to the division. A decree appointing the mother as guardian was entered on January 27, 1970. On February 20, 1970, the division filed a petition to vacate the decree of appointment.[1] The case was heard by a probate judge on February 20, 1970, and on March 6, 1970. The division's petition was dismissed on March 23, 1970. The evidence is reported. The judge filed a report of material facts. The division appealed.

1. The facts are stated above primarily on the basis of the evidence. The judge, in his report of material facts, concluded that "the consent of the mother was not such that she knowingly, willingly, and voluntarily surrendered the child for adoption." As is stated more fully in part 4 of this opinion, we think that the report of material facts is not supported by the evidence in various respects, and that the judge's ultimate conclusion from the evidence is incorrect. The report of material facts and the evidence, however, both show that the judge really considered the case, and that the case essentially was heard, on the issue

---

[1] This petition recited that the child was in the division's custody and control; that the division had no notice or opportunity to be heard with respect to the appointment, and that, upon the facts recited by the division, "the only issue which should be litigated . . . with respect to the . . . child is . . . the revocability of the . . . giving up in writing for . . . adoption, and not the . . . effect of the" guardianship decree.

whether the mother might properly revoke her consent to placing the child for adoption.

On the pleadings, the precise issue before the judge was whether the decree appointing the mother as guardian should be revoked. There was, however, before him a motion by the mother for custody of the child, which in effect seems to have been heard at the same time. We deal with the case on the premise that the basic issue (whether the mother may revoke her consent) has been fully tried. Indeed the mother's brief states that the second issue is whether she "should be allowed to revoke and withdraw . . . consent to the placement of her baby for adoption." Cf. fn. 1, *supra*.

2. The division has clear standing to prosecute this appeal under its broad statutory responsibility to provide and administer throughout the Commonwealth a comprehensive public welfare program, including "adoption services" and "programs of service for . . . children and unmarried mothers." See G. L. c. 18, § 2 (as appearing in St. 1967, c. 658, § 1; see later amendment by St. 1969, c. 885, § 1). The division also has important statutory functions in connection with adoption which make essential notice to it of various proceedings precedent to, or which may affect, adoption of children committed to the division's custody by surrender for adoption. See G. L. c. 210, § 2A (as amended through St. 1957, c. 184); § 3 (as amended through St. 1963, c. 71, § 1); § 3A (as amended through St. 1964, c. 425; § 5A (as amended through St. 1970, c. 404, § 2); and § 5B (as amended through St. 1970, c. 404, § 3). The division has a substantial public interest in protecting the system it has developed for obtaining the adoption of children in need of care and affection. That system obviously could be greatly injured if prospective adoptive parents could not rely on the availability of children placed in their custody, if the relationship proved satisfactory after an experimental period. The division and its officers, seeking to perform a statutory duty or to vindicate a right in a Probate Court proceeding, are to be regarded as persons aggrieved by an

adverse decision in circumstances like those in the present case. See *Kline* v. *Shapley*, 232 Mass. 500, 502.

3. At least in the absence of some emergency (and no facts here suggest that one existed) the division was entitled to prompt revocation of the decree (improperly entered without notice to the division) appointing the mother as the child's guardian. The division should not have been required to litigate the issue of the mother's revocation of her written surrender of the child for adoption, embarrassed by the improper appointment of a contesting party as the child's guardian. The mother by written instrument had surrendered her child for direct placement for adoption. Her further consent to any later adoption was not thereafter to be required. See G. L. c. 210, § 2 (as amended through St. 1970, c. 216); and § 3 (as amended through St. 1963, c. 71, § 1), which provides in part, "A giving up in writing of a child, for the purpose of adoption, to . . . the department of public welfare . . . shall operate as a consent to any adoption subsequently approved . . . by the department of public welfare." See *Surrender of Minor Children*, 344 Mass. 230, 233–234. Until and unless that consent had been set aside as involuntary, the mother should not have been permitted to attempt to interfere with the division's custody to which she had given written consent.

4. It was the duty of the probate judge to consider the evidence in the light of applicable principles of law. See *Surrender of Minor Children*, 344 Mass. 230, 231–237. In that case, as the original papers show, this court reversed a Probate Court decree that the surrenders by a mother of her minor children (and her consent to their adoption) were void. This reversal was ordered solely on the judge's own findings, for there was not, as here, a report of the evidence. That all the evidence is before us gives us a substantially broader scope of review. See *Petition for Revocation of a Decree for Adoption of a Minor*, 345 Mass. 663, 669; *Attorney Gen.* v. *Olson*, 346 Mass. 190, 195; *Holsinger* v. *Holsinger*, 357 Mass. 1, 5. In *Surrender of Minor Children, supra,* this court discussed comprehensively the considerations

which should guide a probate judge in determining (a) whether surrenders were voluntary and made by the surrendering mother with full understanding, and (b) whether there was sufficient "duress" to justify disregarding the surrenders. On findings showing a mother of very limited mental capacity (p. 231) and circumstances affecting that surrendering mother significantly more serious than those of the mother in the case at bar, we ruled that the surrendering mother (p. 235) "understood precisely what she was doing" and (p. 237) "had a fully adequate 'understanding of every fact necessary to . . . [her] consent.'" We also ruled that "pressure of the circumstances and . . . [a] reasonable expectation in respect to [prospective reformatory or jail] confinement [of the mother] did not make the surrenders involuntary." [2] The same decision made clear (p. 237) that voluntary surrenders may not be "revoked [even] with the assent of . . . [a probate] judge without regard for the welfare of the children and solely on considerations of justice to the mother." On the contrary, we clearly stated that "the welfare of the child comes first and the rights of society must be regarded."

In the present case, the mother has not sustained the heavy burden of showing that she is entitled to set aside her consent. The evidence shows (a) explanation to the mother by competent State representatives of the consequences of consent to adoption and of surrender of the child for that purpose; (b) clear knowledge on the mother's part that the division would rely at once on her surrender and consent by placing the child immediately with prospective adoptive parents; and (c) actual reliance on the surrender and consent, both by the division and by the prospective

---

[2] We said (at p. 236), "Contemplation of the surrender of one's own child is in many, if not all, cases a cause of emotional and mental stress. Many such surrenders are undoubtedly by mothers of children born out of wedlock and are contemplated because the trying circumstances tend to show that the welfare of the child calls for action at variance with that dictated by natural instincts of maternal love and affection. No statute has said that surrenders are valid only if executed free from emotion, tensions, and pressures caused by the situation. No principle of law requires the rule. A balance of the interests of the persons concerned and of society weighs strongly against it."

adoptive parents. We perceive in the evidence no sufficient basis for certain of the judge's subsidiary findings, "that she [the mother] was in such a nervous, confused, frightened condition that she did not know what she signed and did what she actually did, not in accordance with her . . . desire but in conformity with the orders of her parents." We give much greater weight than apparently the judge did, to the persuasive testimony (already summarized) (a) of the painstaking explanations to the mother by the division's well qualified representatives, (b) the mother's consideration of the problem and the possible alternatives over a period of weeks,[3] (c) the mother's own testimony about her decision "at least a month before the birth" of the child, (d) the solicitude of the division's representatives to see that the mother was acting in a voluntary manner, and (e) the care exercised by the division concerning execution of the consent papers.

So also, we give greater weight than did the judge to the comparative benefits and detriments to the child (a) of being brought up by an unmarried mother in a home in which she had formerly encountered lack of understanding in a time of great trouble, and (b) of being raised by apparently wholly suitable and desirable adoptive parents who had made the child happy with their affection and care. Reading the evidence convinces us that (although the judge understandably was exceedingly sympathetic with the unhappy plight of this unfortunate mother) his report of material facts does not reflect the true import of the evidence and that his findings and the conclusions drawn from them cannot stand.

As in all proceedings of this character, the predominant consideration must be the welfare of the child. In this case, it is of importance that the child has been with the prospec-

---

[3] The mother's consultations with the division began in July, about a month after her arrival in Massachusetts and continued until after the child's birth in October. The finding is inconsistent with the testimony of the mother's mother that she left her daughter "squarely on her own" without conversation with relatives concerning adoption. Indeed the daughter testified she did not see her parents at all while "carrying the baby."

tive adoptive parents for a substantial time. The child is now (June, 1971) more than a year and a half old. His environment and sense of security should not be disturbed without a clear showing of significant benefit to him. As this court said in *Adoption of a Minor*, 338 Mass. 635, 643, "When a child is placed by its parent for adoption in a good family the inevitable consequence will be that firm bonds of affection and confidence will rapidly arise on both sides. The damage to the child, who cannot understand what is happening, from breaking these bonds is something which even competent psychiatrists may be unable to predict. In the absence of compelling statutory command, such a breach should not be permitted lightly at the request of either of the natural parents who had their chance to take care of the child themselves and who themselves have created the unfortunate situation. The interests of the natural parents in such a case must be completely subordinated to the paramount interest of the child." This court has emphasized increasingly that the interests of the child must be the dominant consideration. See *Adoption of a Minor*, 343 Mass. 292, 298; *Adoption of a Minor*, 357 Mass. 490, 492. Cf. *Kauch, petitioners*, 358 Mass. 327, 329 (where no question of illegitimacy or surrender existed). No religious question arises on this record such as was considered in *Ellis* v. *McCoy*, 332 Mass. 254. The later cases already cited and statutory changes, in any event, have substantially affected that case as a precedent. See G. L. c. 210, § 5B (as amended through St. 1970, c. 404, § 3).

5. The reported evidence requires, under our applicable decisions, that the mother shall not be allowed to revoke her surrender of the child and her consent to its adoption. Because the basic issue (of the revocation of the surrender and consent) in effect has been tried fully, we decide the case on the present record.

6. The decree dismissing the division's petition for revocation of the appointment of a guardian is reversed. The decree appointing the mother as guardian is to be revoked. The motion of the mother for custody is to be denied. The

case is remanded to the Probate Court for further proceedings consistent with this opinion.

*So ordered.*