323 S.E.2d 610

## Paul David McATEE

### v.

## Edith Elizabeth McATEE.

### No. 15971.

Supreme Court of Appeals of West Virginia.

Dec. 6, 1984.

William W. Talbott, Talbott & Alsop, Webster Springs, for appellee.

Stephen G. Jory, Elkins, for appellant.

NEELY, Justice:

The question presented in this case is whether a circuit court has jurisdiction to award custody of a child to one parent without personal jurisdiction over the other parent. For the reasons set forth below, our answer is yes.

Appellant, Edith Elizabeth McAtee, and appellee, Paul David McAtee, were married in Randolph County, West Virginia, on 29 November 1981. The minor child of the couple was born on 5 August 1982. Approximately three months later, on 8 November 1982, Mrs. McAtee left the marital home with the child while Mr. McAtee was at his place of employment and went to her mother's home in Wyoming County. On 9 November 1982 Mr. McAtee filed a complaint in the Circuit Court of Randolph County seeking a divorce and custody of the child.

The summons and complaint were subsequently mailed to Wyoming County for personal service upon the appellant. The record is conflicting as to whether the appellant was actually served. A receipt for the $3.00 service fee received from Mr. McAtee's attorney, written out by the Wyoming County Sheriff's Office, showed the notation "not fd. 11/30/82." However, a return made upon the complaint and forwarded to the Clerk's Office in Randolph County, indicated that the appellant had been personally served on 30 November 1982.

On 15 December 1982 Mr. McAtee's attorney mailed a copy of the summons and complaint in the divorce action to Mrs. McAtee. She, in turn, obtained counsel and forwarded the complaint to him. Mrs. McAtee did not file an answer to the complaint. However, at the divorce hearing which was held on 27 December 1982, her attorney made a special appearance to contest jurisdiction on the grounds that the appellant had not received personal service of process. The Circuit Court of Randolph County, on the basis of the return of service, awarded a divorce and custody of the child to Mr. McAtee.

On 1 February 1983 the appellant filed a motion to vacate the divorce decree on the grounds that the court lacked jurisdiction over her because she was not personally served with process. In her motion the appellant asserted that she was residing in Daytona Beach, Florida during the latter part of November 1982. She attached supporting exhibits to that effect to her petition. The Sheriff of Wyoming County subsequently executed an affidavit in which he stated that personal service of process was never made upon the appellant and that any indication to the contrary on the return of the summons and complaint was erroneous. On the basis of this information and by agreement of the parties, the divorce decree previously entered by the circuit court was set aside on 28 March 1983.

On 11 March 1983, Mr. McAtee filed an affidavit that Edith McAtee was a nonresident of the State of West Virginia and thereafter obtained constructive service upon her by publication and service by mail in compliance with Rule 4(e)(1), *W.Va.R. C.P.* Again the appellant failed to answer or appear. A divorce hearing was held on 26 April 1983 and by order entered the same day the circuit court granted a di-

vorce and custody of the infant child to the appellee father.

The court specifically found that it had jurisdiction to determine the custody rights of the parties because Mrs. McAtee and the child were residing within the State of West Virginia on the date the divorce action was instituted. The court held that the appellant's subsequent move to another state did not deprive it of jurisdiction to decide custody.

On 16 May 1983 the appellant made a special appearance through her counsel and filed a Motion for Relief from Judgment, pursuant to Rule 60(b)(4), *W.Va.R.C.P.*, seeking to have the divorce decree set aside insofar as it related to custody of the infant child. By order entered 10 June 1983 the circuit court denied the motion. The appellant appeals from this final order. She contends that the court lacked jurisdiction to award custody of the parties' child to the appellee because it failed to acquire *in personam* jurisdiction over her.

## I

On 31 March 1981 our Legislature passed the Uniform Child Custody Jurisdiction Act (UCCJA), *W.Va.Code* 48–10–1 *et seq.* [1981]. The Act was designed by the National Conference of Commissioners on Uniform State Laws to avoid jurisdictional competition and confusion and to deter unilateral removals of children undertaken to obtain custody. "Developments in the Law—The Constitution and the Family," *93 Harv.L.Rev.* 1156, 1247 (1980).

The purposes of *W.Va.Code* 48–10–1 *et seq.* [1981] are succinctly stated in Section 1:

(1) Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well being;

(2) Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child;

(3) Assure that litigation concerning the custody of a child takes place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available, and that courts of this State decline the exercise of jurisdiction when the child and his family have a closer connection with another state;

(4) Discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child;

(5) Deter abductions and other unilateral removals of children undertaken to obtain custody awards;

(6) Avoid relitigation of custody decisions of other states in this State insofar as feasible;

(7) Facilitate the enforcement of custody decrees of other states;

(8) Promote and expand the exchange of information and other forms of mutual assistance between the courts of this State and those of other states concerning the same child; and

(9) Make uniform the law of those states which enact it.

Whether the circuit court had jurisdiction to rule on the custody issue in this case appears to be determined by reference to Section 3 of the UCCJA, *W.Va.Code* 48–10–3 [1981] which provides:

(a) A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(1) This State (i) is the home state of the child at the time of commencement of the proceeding or (ii) has been the child's home state within six months before commencement of the proceeding, the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons and a parent or person acting as parent continues to live in this State; or

(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training and personal relationships; or

(3) The child is physically present in this State, and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

(4)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with subdivision (1), (2) or (3) of this subsection, or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

(b) Except under subdivisions (3) and (4) of subsection (a), physical presence in this State of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this State to make a child custody determination.

(c) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody.[1]

■ The first and second provisions of the section on jurisdiction quoted above provide the two major bases for jurisdiction: the "home state" test and the "significant connection" test. Commissioners' Note, *9 Uniform Laws Annotated* at 123. These two tests provide alternative grounds for jurisdiction. First a court in

the child's home state has jurisdiction, and second, if there is no home state or the child and his family have equal or stronger ties with another state, a court in that state has jurisdiction. *Id.*[2]

Home state is defined in *W. Va. Code* 48–10–2(5) [1981] as follows:

"Home state" means the state in which the child immediately preceding the time involved lived with his parents, a parent or a person acting as parent for at least six consecutive months and, in the case of a child less than six months old, the state in which the child lived from birth with any of the persons named. Periods of temporary absence of any of the named persons are counted as part of the six-month or other period; ....

■ In the case *sub judice* it is clear that West Virginia qualified as the home state of the infant child at the time the appellee began the divorce proceeding in Randolph County. The appellant and the infant child were living in Wyoming County, West Virginia when the divorce proceeding was begun and it was not until after the divorce complaint was filed that the appellee took the child to the State of Florida. We are of the view, therefore, that the home state test is satisfied by the facts of this case and that we need not decide whether the "significant connection" test of the UCCJA is met. Nonetheless, for guidance in future cases it is worth digressing for a moment to discuss the "significant connection" test.

## II

■ The significant connection test was specifically drafted to guide courts when a child has been recently removed from his or her home state and the remain-

---

**1.** In the recent case of *Arbogast v. Arbogast,* 174 W.Va. 498, 327 S.E.2d 675 (1984), we recognized that both the UCCJA and the Parental Kidnapping Prevention Act (PKPA) govern interstate child custody disputes. We held that the PKPA extends full faith and credit principles to child custody decrees and has a policy of federal preemption in out-of-state custody disputes. Although we discussed the UCCJA in *Arbogast* as it relates to enforcement of a for-

eign decree the jurisdictional issue under the facts *sub judice* was not addressed. The facts of the instant case do not lend themselves to discussion under *Arbogast* because we have no full faith and credit issue here.

**2.** The UCCJA recognizes that two states may have concurrent jurisdiction and provides for that contingency in Sections 6 and 7 by assuring that only one state makes the custody decision.

ing spouse has also moved away. Commissioners' Note, *9 Uniform Laws Annotated* at 123, *supra*. Under this test, the state with jurisdiction is the one that has maximum access to relevant evidence regarding the child's present or future care, protection, training, and personal relationships. *W.Va.Code* 48–10–3(a)(2) [1981].

■ The UCCJA was designed to place the issue of custody in the forum most appropriate to determine the best interests of the child. Bodenheimer, "The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws," 22 Vand.L.Rev. 1207 (1969). It is particularly significant in this case that the appellee unilaterally removed the infant child of the parties from the State before the issue of custody could be decided. The UCCJA was enacted specifically to discourage this behavior—"child snatching". The record does not indicate that, at the time she removed the child to the State of Florida, the appellant or the child had any significant connection with Florida.

■ "Usually, most significant evidence [on the best interest issue] will have to come from the parents themselves, from other persons who might be entrusted with the care of the child, and from those who can testify about the competence of these persons as custodians." *Id.* at 1223. The record in this case clearly indicates that such evidence will come from persons in the State of West Virginia where the parties were residing at the time the divorce action was instituted and not from persons in the State of Florida with whom the appellant has since come into contact. We

conclude, therefore, that jurisdiction could also have been acquired under the significant connection test.

### III

The appellant contends that the circuit court was without jurisdiction to enter an order affecting custody of the infant child because the court failed to acquire personal jurisdiction over her. She relies upon *Cogar v. Cogar*, 165 W.Va. 797, 272 S.E.2d 58 (1980) where we held that, when custody of a minor child is sought by both parties in a divorce proceeding, and the party having custody of the child resides in another state and has not been personally served with process, a West Virginia circuit court lacks jurisdiction to award custody of the child. We note initially that when *Cogar* was written the UCCJA had not been adopted by this State.

In *Cogar* the Court relied principally on the United States Supreme Court's decision in *May v. Anderson*, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953). In that plurality opinion the Supreme Court held that Ohio was not *required* to afford full faith and credit to a custody decision rendered in Wisconsin because the Wisconsin court failed to acquire personal jurisdiction over the mother, an Ohio resident.[3] In reaching the decision, Justice Burton, writing for the plurality and joined by only three other justices, analogized custody disputes to alimony payments even though he made the often quoted remark that "[r]ights far more precious ... than property rights" were at stake. 345 U.S. at 533, 73 S.Ct. at 843. The plurality's opinion in *May* has been severely criticized since it was first articulated. See Clark, *Domestic Rela-*

---

**3.** *May v. Anderson*, involved a full faith and credit problem. The parents in *May* were married in Wisconsin and lived in that state with their three children until December 1946. Because of marital problems, the parents agreed at that time that the mother would go to Ohio with the children and "there think over her future course." By New Year's Day, she had decided not to return to Wisconsin and, by telephone, so informed her husband. Shortly thereafter, the father filed for divorce in Wisconsin. Although process was served on the mother in Ohio, she did not appear. The father was subsequently awarded a divorce and custody of the children.

Armed with the Wisconsin decree the father went to Ohio and obtained the children from their mother. In 1951, he allowed them to visit their mother and she, in turn, refused to surrender them to the father. He filed a petition for a writ of habeas corpus in Ohio which eventually came before the Supreme Court in *May v. Anderson*. The Ohio courts, under the opinion that they were bound by the Wisconsin decree, decided in favor of the father. The Supreme Court reversed and held that Ohio was not obliged to give effect to the Wisconsin decree rendered without personal jurisdiction over the mother.

*tions,* § 11.5 (1968); Bodenheimer and Neeley—Kvarme, "Jurisdiction Over Child Custody and Adoption after Shaffer and Kulko," *12 U.Cal.D.L.Rev.* 229 (1979).

Justice Frankfurter's concurring opinion, on the other hand, is widely acknowledged as having set forth the better view and *May v. Anderson, supra,* has been interpreted in accord with that concurrence. Justice Frankfurter's view of *May* was that it permitted states to recognize foreign custody decrees rendered without personal jurisdiction over an absent parent under local law but did not require them to do so under the Full Faith and Credit Clause. As pointed out by Justice Frankfurter:

> This Court does not decide that Ohio would be precluded from recognizing, as a matter of local law, the disposition made by the Wisconsin court. For Ohio to give respect to the Wisconsin decree would not offend the Due Process Clause. Ohio is no more precluded from doing so than a court of Ontario or Manitoba would be, were the mother to bring the children into one of these provinces. 345 U.S. at 535–36, 73 S.Ct. at 844.

The UCCJA was based on Justice Frankfurter's interpretation of the plurality's opinion in *May, supra,* and does not require *in personam* jurisdiction over both parents. *See* Bodenheimer & Neeley—Kvarme, *supra,* at 251; Restatement (Second) of Conflict of Laws § 79, Comment (c) (1971); Note, "Jurisdiction—Uniform Child Custody Jurisdiction Act," *51 Temple L.Q.* 139, 148 (1978). The Act has withstood various constitutional challenges that it violates the due process rights of a parent whose child's custody is adjudicated in a court that has failed to acquire personal jurisdiction over that parent. *See, e.g. Goldfarb v. Goldfarb,* 246 Ga. 24, 268 S.E.2d 648 (1980); *Pratt v. Pratt,* R.I., 431 A.2d 405 (1981); *Hudson v. Hudson,* 35 Wash.App. 822, 670 P.2d 287 (1983).

The basis for most decisions upholding the jurisdictional provisions of the UCCJA is found in the Supreme Court's decision in *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). In that case the Court abolished the distinctions formerly recognized between actions *in rem* and actions *in personam,* and held that the minimum contact standard of *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) applies to both. "[A]ll assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny." 433 U.S. at 212, 97 S.Ct. at 2584.[4]

The Court in *Shaffer,* however, recognized that although the single standard of *International Shoe* "could be easily applied in the vast majority of cases,"[5] it could not accommodate all necessary litigation. Thus, the Court carved out certain exceptions from the new rule. The Court wrote: "We do not suggest that jurisdictional doctrines other than those discussed in text, such as the particularized rules governing adjudication of status, are inconsistent with the standard of fairness." *Shaffer v. Heitner, supra,* n. 30, 433 U.S. at 208, 97 S.Ct. at 2582 n. 30.

Footnote 30 of *Shaffer* has been interpreted as recognizing adjudications of status as an exception to the "minimum contacts" requirement. *Hudson v. Hudson, supra;* Bodenheimer & Neeley—Kvarme, *supra;* Restatement (Second) of Conflict of Laws §§ 69–71 (1971). As stated in "Developments in the Law—The Constitution and the Family," *93 Harv.L.Rev.* 1156, 1246 (1980):

> [C]hild custody proceedings should be viewed as following within *Shaffer's* "status classification." Status is a "relationship between two persons which is not temporary in its nature, is not terminable at the mere will of either and with which the State is concerned.

---

**4.** *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) held that a state may subject foreign corporations and other nonresidents to judgments *in personam* only if the nonresident has certain minimum contacts with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."

**5.** 433 U.S. at 211, 97 S.Ct. at 2583.

[Footnote omitted] The notion of status undoubtedly encompasses the parent-child relationship, as it did at common law, and a broad spectrum of authorities has classified child custody proceedings as actions involving personal status. [Footnote Omitted] A state's interest in protecting a child by adjudicating her status is if anything greater than its interest in adjudicating the marital status of an adult, given the vulnerability of children and their need for a stable home environment. [Footnote omitted]

■ We agree with the authorities who interpret the status exception in *Shaffer* as a *"res"* that may be determined in the absence of personal jurisdiction. A court may, therefore, adjudicate custody under the UCCJA without acquiring personal jurisdiction over the absent parent and such adjudication does not violate the absent party's due process rights if the notice provisions of the Act have been complied with. Notice provisions are found in *W. Va. Code* 48–10–4 [1981] which states:

Before making a decree under this article, reasonable notice and opportunity to be heard shall be given to the contestants, any parent whose parental rights have not been previously terminated and any person who has physical custody of the child. If any of these persons is outside this State, notice and opportunity to be heard shall be given pursuant to section five [§ 48–10–5] of this article.[6]

■ In the case *sub judice* the record clearly indicates that Mrs. McAtee was notified by mail of the pending divorce and custody proceeding. She even went so far as to hire counsel to represent her and she makes no assertion that she had inadequate actual notice.

Instead she contends that the Court was without jurisdiction to enter a custody decree because it did not acquire personal jurisdiction over her. As we indicated above, however, there is no merit in that argument and the appellant received actual notice of the custody suit by process that complied with *W. Va. Code* 48–10–5(a)(3) [1981]. We conclude, therefore, that the assumption of jurisdiction by the circuit court satisfied the "traditional notions of fair play and substantial justice" *Shaffer, supra,* that are an inherent part of due process.

### IV

In her brief Mrs. McAtee asserts that because she stayed at home with the child during the day and the appellee worked outside the home she is obviously the primary caretaker and entitled to custody. She states that it would be "fruitless to require [her] to suffer the expense of returning to Randolph County only to achieve the obvious result, custody of her child." But the UCCJA was designed to cover situations such as the one before us where a child is surreptitiously removed to another state prior to any custody litigation.[7] *See,* Bodenheimer, "Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction Under the UCCJA," *14 Family L.Q.* 203, 205 (1981).

---

6. *W. Va. Code* 48–10–5 [1981] provides:
   (a) Notice required for the exercise of jurisdiction over a person outside this State shall be given in a manner reasonably calculated to give actual notice and may be:
   (1) By personal delivery outside this State in the manner prescribed for service of process within this State;
   (2) In the manner prescribed by the law of the place in which the service is made for service of process in that place in an action in any of its courts of general jurisdiction;
   (3) By any form of mail addressed to the person to be served and requesting a receipt;
   (4) As directed by the court, including publication, if other means of notification are ineffective.

7. *See,* Bodenheimer & Neeley—Kvarme, *supra,* at 246 which states that approximately 70 percent of parental abductions involve pre-decree removals. *Also see,* 345 U.S. 534 n. 8, 73 S.Ct. 844 n. 8, *May v. Anderson, supra;* which states:
   "The instant case does not present the special considerations that arise where a parent, with or without minor children, leaves a jurisdiction for the purpose of escaping process or otherwise evading jurisdiction, and we do not have here the considerations that arise when children are unlawfully or surreptitiously taken by one parent from the other."

The Commissioner's Prefatory Note to the UCCJA eloquently states the problem:

There is growing public concern over the fact that thousands of children are shifted from state to state and from one family to another every year while their parents or other persons battle over their custody in the courts of several states. Children of separated parents may live with their mother, for example, but one day the father snatches them and brings them to another state where he petitions the court to award him custody while the mother starts custody proceedings in her state; or in the case of illness of the mother the children may be cared for by grandparents in a third state, and all three parties may fight over the right to keep the children in several states. These and many similar situations constantly arise in our mobile society where family members often are scattered all over the United States and at times over other countries. A young child may have been moved to another state repeatedly before the case goes to court. When a decree has been rendered awarding custody to one of the parties, this is by no means the end of the child's migrations. It is well known that those who lose a court battle over custody are often unwilling to accept the judgment of the court. They will remove the child in an unguarded moment or fail to return him after a visit and will seek their luck in the court of a distant state where they hope to find—and often do find—a more sympathetic ear for their plea for custody. The party deprived of the child may then resort to similar tactics to recover the child and this "game" may continue for years, with the child thrown back and forth from state to state, never coming to rest in one single home and in one community.

The harm done to children by these experiences can hardly be overestimated. It does not require an expert in the behavioral sciences to know that a child, especially during his early years and the years of growth, needs security and stability of environment and a continuity of affection. A child who has never been given the chance to develop a sense of belonging and whose personal attachments when beginning to form are cruelly disrupted, may well be crippled for life, to his own lasting detriment and the detriment of society. UCCJA, 9 *U.L.A.,* Commissioners' Prefatory Note at 111–12.

■ Mrs. McAtee may be correct that if she had appeared she would have qualified for custody under *Garska v. McCoy,* 167 W.Va. 59, 278 S.E.2d 357 (1981) as the primary caretaker. Nonetheless, she is required to appear so that the issues of *whether* she is the primary caretaker and *whether* she is a fit parent may be litigated. But because the case before us is one of first impression, and today's holding concerning jurisdiction might not have been predictable in advance in light of such cases as *May v. Anderson, supra,* we are reluctant to allow the question of custody in this case to be answered forever exclusively on the basis of a default. Although parties to a suit act at their own peril when they are cavalier about court appearances, in the case before us the interests of an innocent child are at stake and those interests must be taken into account by a court of equity. *Lex deficere non potest in justitia exhibenda.*

■ A court may modify its custody decree at any time; consequently, we hold that in the case *sub judice* the appellant be allowed to move for modification of the trial court's order awarding appellee custody and we further hold that the motion should be heard on the basis of the *Garska* standard without need to show the changed circumstances that are ordinarily necessary in a modification proceeding. Such leave to move to modify, however, is conditioned upon appellant's returning the child to West Virginia within ten days from the entry of the order in this case, all rehearing petitions and other motions of any type in

this Court notwithstanding, and the filing of her motion within the same ten-day period. Failure to follow these requirements sedulously will be construed as deliberately contumacious behavior justifying of an award of custody against appellant by default.

Affirmed but remanded with directions.