343 S.E.2d 101

**Tammy LEMLEY**

v.

**Gene BARR et al.**

No. 16764.

Supreme Court of Appeals
of West Virginia.

March 11, 1986.

Deana L. Cooper, Burd & Cooper, Chesapeake, Ohio, for appellant.

Herbert H. Henderson, Henderson & Henderson, Huntington, W.Va., for appellees.

NEELY, Justice:

On 30 January 1981 Tammy L. Lemley and Bobby Lee Nash, Sr., gave birth to Bobby Lee Nash, Jr. in Lawrence County, Ohio, the place of their residence. These two parents were without benefit of marriage, education, or real means of support. Mr. Nash, the natural father, wanted to give the child up for adoption, and encouraged Tammy Lemley to do so. Accordingly, they contacted J. Stewart Kaiser and John E. Hall, attorneys in Chesapeake, Ohio, concerning the possible placement of the child.

On 5 May 1981, four days before Tammy Lemley turned eighteen, Tammy Lemley and Bobby Lee Nash went to Mr. Kaiser's and Mr. Hall's office to relinquish the child and execute the necessary papers for adoption. Tammy Lemley became upset, refused to sign the papers and left with the child. The next day the young couple returned to the law offices, executed the papers, and relinquished the child to Mr. Kaiser and Mr. Hall. Later that day, Mr. Hall delivered the child to Gene and Anna Barr at their house in Huntington, West Virginia.

On 11 May 1981, two days after Tammy Lemley reached majority, Mr. Kaiser and Mr. Hall informed Miss Lemley that she must meet with them again to sign more papers regarding the adoption. At Mr. Kaiser's direction the young couple met Mr. Hall in the parking lot of the Omelet Shop in Huntington, West Virginia where Tammy signed the papers in return for $400.00. That same day, Tammy Lemley's parents went to the law offices of Kaiser and Hall to demand the return of the child. The parents explained to Mr. Kaiser that Tammy was a minor at the time of the transaction. Mr. Kaiser told them that it was too late to do anything and that he could offer them no help. At no time did Mr. Kaiser explain to Tammy Lemley, Bobby Lee Nash, Sr., or Tammy's parents that under Ohio law an Ohio Probate Court judge had to witness and approve a minor's consent.[1]

On 18 May 1981, Tammy Lemley and Bobby Lee Nash, Sr. returned to Mr. Kaiser's office to seek the return of the child. Again Mr. Kaiser refused to assist them. Furthermore, Mr. Kaiser refused to divulge the identity of the couple to whom he had transferred the child. In June, 1981 Miss Lemley and her parents instituted a habeas corpus action in Ohio against Mr. Kaiser, Mr. Hall and the unknown custodian of the child asking for the child's return. On 24 September 1981, the Court of Common Pleas, Lawrence County, Ohio, Probate and Juvenile Division, held that the placement had been illegal and improper under *Ohio Rev.Code Ann.* 5103.16 [Page 1981] because the adopting parents had not filed the requisite papers in the Probate Court. The court found that Mr. Kaiser and Mr. Hall had obtained Tammy's consent through duress, that she had no understanding of her position at the time she signed the adoption papers and, therefore, her consent was invalid. The Ohio court also held that attorneys Kaiser and Hall must divulge the name of the child's custodians.

On 13 August 1982 the Ohio Court of Appeals unanimously affirmed the Court of Common Pleas' judgment. Finally, on 24 August 1983, two years and two months after the Lemleys first brought their petition, the Ohio Supreme Court affirmed the trial court's judgment and the names of the child's custodians, Gene and Anna Barr, were revealed.

The Barrs knew about the Ohio habeas corpus proceeding through their discussions with Mr. Kaiser and through news reports both on television and in print. They discussed whether to appear physically in the Ohio proceedings, whether they should comply with the judgment of the Ohio trial court, and whether they should divulge their identities. The Barrs knowingly and intentionally refused to reveal their names, and directed Mr. Kaiser and Mr. Hall to exercise the attorney-client privilege on their behalf. Finally, despite the Barr's knowledge of the ongoing Ohio proceedings, they filed for adoption in front of Judge D.B. Daugherty of the Circuit Court of Cabell County, West Virginia on 6 November 1981. As the Ohio Supreme Court noted:

> "We are confronted with a factual milieu which forcefully suggests and overwhelmingly implies that appellants were active participants in the private, independent and surreptitious placement for adoption of the minor child without the slightest regard for and in complete contravention of the applicable statutory guidelines for such independent placements."

*Lemley v. Kaiser,* 6 O.B.R. 324, 6 Ohio St.3d 258, 452 N.E.2d 1304, 1306 (1983). The Barrs attempted legally to avoid the jurisdiction of the Ohio courts.

When the identity of the Barrs was finally disclosed to Miss Lemley and her parents, they brought a habeas corpus action in the Circuit Court of Cabell County, West Virginia to compel the Barrs to return the child in accordance with the Ohio judgment. The trial court, however, declined to give

---

**1.** *Ohio Rev.Code Ann.* 5103.16 [Page 1981] outlines the procedures and prerequisites for the placement of children.

full faith and credit to the Ohio judgment on the basis that the Barrs were never parties to the Ohio suit, and ruled that the 6 November 1981 West Virginia adoption proceeding, which the Barrs had initiated during the pendency of the Ohio action, was proper. The Lemleys then appealed that ruling to this court and asked us to uphold the judgment of our Ohio brethren and order the Circuit Court of Cabell County to give that judgment full faith and credit.

On 13 November 1985 this Court rendered its initial decision in the case now before us and ordered that the Circuit Court of Cabell County grant full faith and credit to the Ohio judgment. The issue that was briefed and argued during our first hearing, and the issue that was decided by the court's initial opinion, concerned only the question of whether West Virginia must give full faith and credit to the Ohio court judgment in determining the validity of the West Virginia adoption. Nonetheless, the judges of this Court were concerned at the time with the welfare of the child, now known as Ryan Barr, and we so indicated in the penultimate paragraph of our original opinion. That paragraph said:

> Accordingly, the judgment of the Circuit Court of Cabell County is reversed and the case is remanded with directions to the court to formulate an orderly transfer of custody from the Barrs to the Lemleys. Although the Lemleys have prevailed on all legal issues, it must be remembered that we are not ordering the transfer of a piece of property, but rather with a feeling, vulnerable, and sorely put upon little human being. If the circuit court finds that continuing emotional support from the Barrs, the only family this child has ever known, is important for the welfare of the child, the court may order reasonable visitation and otherwise use its sound discretion to reduce the trauma that will inevitably follow from our decision.

On 12 December 1985, Mr. and Mrs. Barr filed a petition for rehearing in this Court. In Section III of their petition for rehearing they advised this Court that we had not heard arguments about or adequately considered the question of the best interest of the child. In support of their petition for rehearing they cited Syl. Pt. 3, *State ex rel. Lipscomb v. Joplin*, 131 W.Va. 302, 47 S.E.2d 221 (1948) where the Court held:

> In a proceeding involving the custody of an infant the right of a parent to the custody of his child, being founded in nature and wisdom and declared by statute, will be respected unless transferred or abandoned; the Court is in no case bound to deliver the child into the custody of any claimant and may permit it to remain in such custody as its welfare at the time appears to require.

Included in the opinion in *Lipscomb v. Joplin* was the following passage:

> The writ of habeas corpus, so deeply cherished by the liberty loving people of this State, and so essential to the protection of their individual freedom, may be invoked to settle disputes which involve the custody of infant children. When used for that purpose the writ is of an equitable nature and the proceeding resembles an equitable proceeding in *rem* in which the *res* is the child. [Citations omitted]. In a proceeding in habeas corpus involving the right to the custody of an infant the vital and controlling question is the welfare of the child and its determination rests in the sound discretion of the court.... [T]he law does not recognize any absolute right in any person or claimant to the custody of a child. *Pukas v. Pukas*, 129 W.Va. 765, 42 S.E.2d 11. A court is not required, in any case, to award the custody of a child to any claimant or any other person but may leave or place it in such custody as its welfare at the time may dictate or require. [Citations omitted].

131 W.Va. at 308–309, 47 S.E.2d at 225.

On 13 January 1986 we granted a rehearing in the case before us to address the question of the best interests of Ryan Barr. In our original opinion we said: "To state the obvious, the only party now before us who has come with totally clean hands is the child himself, and he is entitled to some

consideration from our courts because he is a human being." Accordingly, for reasons explained in Sections I and II we conclude that Miss Lemley is entitled to have our courts accord the Ohio judgment full faith and credit in terms of setting aside the formal West Virginia adoption. We are not convinced, however, that it is in the best interests of Ryan Barr that his physical custody be changed at this time and, for reasons explained in Section III, we remand this case to the Circuit Court of Cabell County for further proceedings to determine the best interests of the child.

## I

■ The central *legal* issue presented by this case is whether the Ohio judgment invalidating an Ohio adoption is entitled to full faith and credit in the West Virginia courts. This Court has clearly enunciated and consistently applied the principles under which it will grant full faith and credit to the judgment of a sister state. These principles are most succinctly stated in the first three syllabus points of *State ex rel. Lynn v. Eddy*, 152 W.Va. 345, 163 S.E.2d 472 (1968):

> "I. Under article IV, § 1, of the *Constitution of the United States*, a valid judgment of a court of another state is entitled to full faith and credit in the courts of this state.
>
> "II. 'Full faith and credit must be given to the judgment or decree of a sister-state if it is not successfully attacked on jurisdictional grounds.' Point IV, Syllabus, *Brady v. Brady*, 151 W.Va. 900, 158 S.E.2d 359 (1967).
>
> "III. By virtue of the full faith and credit clause of the *Constitution of the United States*, a judgment of a court of another state has the same force and effect in this state as it has in the state in which it was pronounced."

Accordingly, we must enforce the Ohio judgment unless we find that the Ohio court lacked jurisdiction.

■ Unless a foreign state exceeds its powers under the *Constitution of the United States*, the law of the foreign state governs the determination of whether the court of a foreign state has jurisdiction. *Aldrich v. Aldrich,* 147 W.Va. 269, 127 S.E.2d 385 (1962) *rev'd on other grounds*, 378 U.S. 540; 84 S.Ct. 1687, 12 L.Ed.2d 1020 (1964). Accordingly, the laws of Ohio determine the validity of the Ohio court's jurisdiction.

■ Furthermore, the Barrs bear the burden of proving that the Ohio court did not have jurisdiction. The Court of Common Pleas of Lawrence County, Probate and Juvenile Division (the trial court that originally heard this matter) is a court of general jurisdiction. *Ohio Const.*, Art. IV, Section 4 [1973] (Courts of common pleas vested with general jurisdiction); [2] *State ex rel. Heimann v. George*, 45 Ohio St.2d 231, 233, 344 N.E.2d 130, 74 Ohio Op.2d 376, 377 (1976) (courts of common pleas are courts of general jurisdiction and possess the authority to determine their own jurisdiction over both the person and subject matter in actions before them). Thus a determination by an Ohio common pleas court that the court has jurisdiction creates a presumption that the court had jurisdiction. In this regard we have held:

> "If the court, which rendered the judgment, was a court of general jurisdiction, the presumption is it had jurisdiction of the particular case, and to render the judgment void, this presumption must be overcome by proof" Syl. pt. 3, *Gilchrist v. O. & O.L. Co.*, 21 W.Va. 115 (1882).

*Fortner v. Fortner*, 168 W.Va. 70, 282 S.E.2d 48 (1981).[3] Accordingly, the judgment of the Ohio court is entitled to the benefit of a presumption that it had juris-

---

**2.** Furthermore, *Ohio Rev.Code Ann.* 2101.24(J) [Page 1976] specifically grants probate courts jurisdiction to issue writs of habeas corpus.

**3.** This presumption is a mere application of the rule that judgments of a court of record are presumptively valid. *Voorhees v. Jackson, ex dem. Bank of U.S.* 35 U.S. 449, 10 Pet. 449, 9

L.Ed. 490 (1836). Although Ohio has adopted the general rule, *see In re Guardianship of Kelley*, 172 Ohio St. 177, 174 N.E.2d 244, 15 Ohio Op.2d 327 (1961), it has never specifically addressed whether this presumption extends to jurisdiction.

diction over both the subject matter and the parties.

## II

■ The Barr's position is that the Ohio court never obtained personal jurisdiction over them. They argue that the Ohio judgment was obtained without service of process upon them and without their appearance in the action. While it is true that the Barrs did not set foot in the State of Ohio during the pendency of the Ohio proceedings, they had more than minimum contacts with the adoption transaction, and this permits the Ohio courts to assert personal jurisdiction over them. Furthermore, the Barrs had *actual notice* of the lawsuit.

The provisions of the Uniform Child Custody Jurisdiction Act (*UCCJA*) guides our inquiry into the Ohio Court's jurisdiction. *Ohio Rev.Code Ann.* 3109.21 to 3109.37 [Page 1980]; *W.Va.Code*, 48–10–1 to 48–10–26 [1981].[4] The jurisdictional provisions of the *UCCJA* read as follows:

§ 3109.22 [Jurisdiction to determine custody of child].

(A) No court of this state having jurisdiction to determine the custody of a child shall exercise that jurisdiction unless one of the following applies:

(1) This state is the home state of the child at the time of commencement of the proceeding, *or this state had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state;*

(2) It is in the best interest of the child that a court of this state assumes jurisdiction because the child and his parents, *or the child and at least one contestant, have a significant connection with this state, and there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;*

(C) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody. [Emphasis supplied by the Court][5]

The present case falls squarely into either *Ohio Rev.Code Ann.* 3109.22(A)(1) or *Ohio Rev.Code Ann.* 3109.22(A)(2). The child was born in Ohio by Ohio parents; he was transferred to Mr. Kaiser and Mr. Hall in Ohio; and, the first consent form was signed in Ohio. He was absent from Ohio only because Mr. Kaiser and Mr. Hall had removed him, and the Barrs retained him. Accordingly, it is fair to say that the placement transaction took place in Ohio. Both under the *UCCJA* and the *U.S. Constitution* the action has more than "minimum contacts" with Ohio. Indeed, Ohio has quite a significant connection with the transaction.

The Barrs' challenge to the Ohio courts' jurisdiction must be bottomed on the premise that they never received notice of the Ohio proceedings either because they were not served with process, or did not submit to the Ohio court's jurisdiction. We hold, however, that the Barrs had the actual notice that service of process is designed to provide, and that they appeared in the Ohio proceeding through Mr. Kaiser and Mr. Hall when they directed them to assert the attorney-client privilege on their behalf. Thus the Ohio proceedings had the procedural due process requirements of notice and opportunity to be heard.

## A

The Lemleys named the Barrs as "Jane Doe" parties pursuant to *Ohio R.Civ.P.*

---

**4.** Both Ohio and West Virginia have enacted the "UCCJA." The West Virginia legislature passed the act on 31 March 1981 and the act did not come into effect until ninety days later on 29 June 1981. 1981 W.Va. Acts c. 207. However, the act became effective in Ohio on 25 October 1977. *Ohio Rev.Code Ann.* 3109.21 (Page 1980).

Because the law of Ohio applies in our determination of the Ohio courts' jurisdiction, any question of retroactive application of the law is obviated.

**5.** *W.Va.Code,* 48–10–3 [1981] (same statute).

15(D). Mr. Kaiser and Mr. Hall contacted them and apprised them of the lawsuit. Furthermore, the Barrs knew about the lawsuit through the constant attention it received in the media. The notice requirements under the *UCCJA* are more liberal than the notice requirements elsewhere in the law. *Ohio Rev.Code Ann.* 3109.23 [Page 1980].[6] In *Spaulding v. Spaulding*, 460 A.2d 1360 (Me.1983), the plaintiff father asked the Maine court to deny enforcement of a Colorado decree granting custody of his children to his spouse on the grounds that the Colorado court never obtained personal jurisdiction over him because he never had notice of the proceedings. The Supreme Judicial Court of Maine held that under the notice provisions of the *UCCJA* that service of process upon the attorney, who had represented the father throughout other post-divorce proceedings, was sufficient to give the father notice of the proceeding even though the father claimed to have terminated his relation with the attorney. *Id.* at 1364–5.[7] In the present case, the Barrs had a previous relation with Mr. Kaiser and Mr. Hall. Accordingly, service of process upon their attorneys should be enough to give the Barrs notice. But we need not investigate whether there was "constructive" service of process; *Ohio Rev.Code Ann.* 3109.23(E) eliminates the notice requirement where one of the contestants submits to the jurisdiction of the court. *In Re B.R.F.*, 669 S.W.2d 240 (Mo.App.1984) (Under *UCCJA* 5(d)[8] appearance by party waives any objection party had of lack of notice and the court had jurisdiction over his person). In the present case, the Barrs made a general appearance in the Ohio proceedings through their attorneys Mr. Kaiser and Mr. Hall.

### B

The Barrs instructed Mr. Kaiser and Mr. Hall to invoke the attorney-client privilege on their behalf. The Ohio legislature has codified the common law privilege. *Ohio Rev.Code Ann.* 2317.02(A) states:

2317.02 Privileged communications and acts.

(A) An attorney, concerning a communication made to him by his client in that relation or his advice to his client; but the attorney may testify by express consent of the surviving spouse or the executor or administrator of the estate of such deceased client; and if the client voluntarily testifies, the attorney may be compelled to testify on the same subject;

. . . . .

The Ohio statute clearly retains the common law position that the attorney-client privilege is the privilege of the client that an attorney exercises *on his client's behalf.* As one court stated "... only the client can unseal his attorney's lips; ..." *Timken Roller Bearing Company v. United States*, 38 F.R.D. 57 (N.D.Ohio 1964). The attorney-client privilege exists for the client's and not the lawyer's protection. Viewed this way, Mr. Kaiser's and Mr. Hall's invoking of the attorney-client privilege in the Ohio proceedings could only be for the benefit of the Barrs and, therefore, constitutes an appearance.

 Other aspects of the attorney-client privilege support this line of analysis. The burden of showing that the testimony sought to be excluded under the doctrine of

---

6. The statute provides in pertinent part:

(A) Before making a custody decree, *the court shall give reasonable notice of the custody proceeding and opportunity to be heard to the contestants, any parent whose parental rights have not been previously terminated, and any person or public agency who has physical custody of the child.* If any of these persons or the public agency is outside this state, notice and opportunity to be heard shall be given in accordance with division (B) of this section ...

(E) *Notice is not required if a person submits to the jurisdiction of the court.* [Emphasis added by Court] *Code,* 48–10–5 [1981] (same statute).

7. We should note that *Colorado R.Civ.P.* 5(b) provides for service upon a party's attorney. Although Ohio has no similar provision, appearance by a duly authorized attorney is equivalent to personal service of process on the defendant, and effective to give jurisdiction over his person. *Limbaugh v. Western O.R. Co.*, 94 Ohio St. 12, 113 N.E. 687 (1916).

8. *UCCJA* 5(d) is identical to *Ohio Rev.Code Ann.* 3109.23(E) and *W.Va.Code,* 48–10–5(d).

privileged attorney-client communications rests upon the party seeking to exclude it. *In re Martin*, 141 Ohio St. 87, 47 N.E.2d 388, 25 Ohio Op. 225 (1943). Accordingly, the Barrs' use of attorney-client privilege in the Ohio proceedings is tantamount to raising a defense. By raising a defense in the Ohio proceeding the Barrs made a general appearance, and thus, they submitted to the Ohio court's jurisdiction. As we have held: "An appearance in a suit or action for any purpose other than to question the jurisdiction of the court, or to set up a lack of progress, or defective service is a general appearance." Syl. Pt. 1, *Stone v. Rudolph*, 127 W.Va. 335, 32 S.E.2d 742 (1944).[9] If the Barrs wanted to challenge the Ohio court's jurisdiction they were free to do so, but having fought the suit on the basis of the attorney-client privilege, and having lost, they cannot now raise the jurisdictional issue.

### III

■ Although this Court has often held that the welfare of a child is the cynosure of any custody determination, such a standard provides us with little guidance in the case before us because, as the New York Court of Appeals said in *Bennett v. Jeffreys*, 40 N.Y.2d 543, 550, 387 N.Y.S.2d 821, 827, 356 N.E.2d 277, 284 (1976):

> The resolution of cases must not provide incentives for those likely to take the law into their own hands. Thus, those who obtain custody of children unlawfully, particularly by kidnapping, violence, or flight from the jurisdiction of the courts, must be deterred. Society may not reward, except at its peril, the lawless because the passage of time has made correction inexpedient.

This pronouncement from one of America's most highly respected courts would almost be dispositive of the case before us had not the New York Court of Appeals gone on to say in the very same paragraph:

> Yet, even then, circumstances may require that in the best interest of the child, the unlawful acts be blinked [Citations omitted].

Certainly in the case before us we do not have an instance of kidnapping, violence, or flight from the jurisdiction of the court. Indeed, the Barrs used all possible legal strategems to avoid an unfavorable ruling in the Ohio courts, but at no time did they resort to self-help by fleeing or by refusing to follow a lawful court order. And, although Miss Lemley was young, frightened, and inexperienced, she *did* sign papers on two occasions consenting to an adoption, and she *accepted* money for the payment of her medical expenses. Nonetheless, Miss Lemley has equity on her side too; she did not sleep upon her rights. She tried to regain possession of Ryan immediately and it is difficult for us to tell her now that she cannot have Ryan because it is "too late." Yet, as we have already indicated, the only entirely innocent party in these proceedings is the child, Ryan Barr.

The record before us is devoid of detailed evidence concerning what is now in the best interests of Ryan Barr. But we do know from the facts of record that Ryan is a five-year-old child who has spent almost his entire life with an adoptive mother, father and siblings in Huntington, West Virginia. If we now transfer custody to Miss Lemley, who counsel informs us has married, he will be taken to another place and brought up by people who are complete strangers to him. Although we cannot say that this is not in his best interests, we can at least say that there is some question in our mind whether such action is appropriate. Consequently, we remand this case to the circuit court for a determination of

**9.** *See also Smith v. Smith*, 138 W.Va. 388, 76 S.E.2d 253, 260 (1953) (plea in abatement by wife, after defective service of process, which challenged only the jurisdiction of the court to determine custody of children, was in effect an admission of jurisdiction to entertain suit and to adjudicate other issues involved and amounted to a general appearance); *Scott v. Davis*, 173 Ohio St. 252, 181 N.E.2d 470, 19 Ohio Op.2d 77 (1962) (where a demurrer to the petition attacks the petition on the basis that it does not state a cause of action, such a demurrer relates to the merits of the cause and constitutes a general entry of appearance).

what physical custody arrangement is in Ryan's best interests.

To aid the circuit court in the determination of this issue it is ordered that the West Virginia Department of Human Services be called upon in this proceeding to prepare a plan for the custody of Ryan Barr that will serve his best interests, keeping appropriately in mind Miss Lemley's legal rights and Ryan's right to be treated as a human being. For as the Court of Appeals of New York said in *Bennett v. Jeffreys:*

> The day is long past in this State, if it had ever been, when the right of a parent to the custody of his or her child, where the extraordinary circumstances are present, would be enforced inexorably, contrary to the best interest of the child, on the theory solely of an absolute legal right. Instead, in the extraordinary circumstance, when there is a conflict, the best interest of the child has always been regarded as superior to the right of parental custody. Indeed, analysis of the cases reveals a shifting of emphasis rather than a remaking of substance. This shifting reflects more the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest. A child has rights too, some of which are of a constitutional magnitude. [Citations omitted].

40 N.Y.2d at 546, 387 N.Y.S. at 824, 356 N.E.2d at 281.

There is ample, recent authority in West Virginia and elsewhere justifying our placement of the equitable rights of Ryan above the legal rights of his mother.[10] For example, in *W.Va. Department of Human Services v. La Rea Ann C.L.,* 175 W.Va. 330, 332 S.E.2d 632 (1985), this Court said:

> While this Court heretofore has not specifically applied the best interest stan-

dard to relinquishment approval cases, a very close analogy may be drawn from this Court's treatment of child custody situations. We have repeatedly held that in contests involving the custody of infants the welfare of the child is of paramount and controlling importance and is the "polar star" by which the discretion of the court will be guided.

175 W.Va. at 335, 332 S.E.2d at 637. In *La Rea Ann C.L.,* we specifically declined to apply the rule in *Commonwealth ex rel. Martino v. Blough,* 201 Pa.Super. 346, 191 A.2d 918 (1963) where the court had refused to take into consideration changed circumstances affecting the welfare of the child caused exclusively by judicial delay.

*In Revocation of Appointment of A Guardian,* 360 Mass. 81, 271 N.E.2d 621 (1971), the Supreme Judicial Court of Massachusetts did not permit the return of an infant to his natural mother where the mother had not read the relinquishment form which she signed after it had been explained to her. The court expressed an interest in protecting the state adoption system and stated that the "system obviously could be greatly injured if prospective adoptive parents could not rely on the availability of children placed in their custody." 360 Mass. at 85, 271 N.E.2d at 624. The Massachusetts court held that the predominant consideration in such cases was always the welfare of the child, and that where an infant had been in the home of prospective adoptive parents for a substantial period, in that case a year and a half, "[h]is environment and sense of security should not be disturbed without a clear showing of significant benefit to him." 360 Mass. at 89, 271 N.E.2d at 625. *See also In Re Baby Boy Reyna,* 55 Cal.App.3d 288, 126 Cal.Rptr. 138 (1976) and *In Re DiMatteo,* 62 N.C.App. 571, 303 S.E.2d 84 (1983).

---

**10.** *See May v. Anderson,* 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953), particularly Frankfurter, J. concurring, and *McAtee v. McAtee,* 174 W.Va. 129, 323 S.E.2d 611 (1984) for the proposition that full faith and credit *need* not be given under the *U.S. Constitution* to foreign judgments about custody if they are contrary to the best interests of the child. However, in most in-

stances, as *McAtee* indicates, the better policy is to enforce foreign judgments under both principles of comity and the flexible criteria of the *UCCJA.* In the case before us, however, we may modify so much of the Ohio Court of Common Pleas judgment as relates to physical custody, *W.Va.Code,* 48–10–3 [1981] and 48–10–15 [1981].

In the case now before us the circuit court, upon remand, is entitled to appoint at state expense an impartial expert to advise both the circuit court and the Department of Human Services with regard to an appropriate custody arrangement in the best interest of Ryan.

Therefore, for the reasons set forth above, the judgment of the Circuit Court of Cabell County is reversed and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.