PATRICIA A. BULLARD, Plaintiff-Appellee, *v.* TIMOTHY I. BULLARD, Defendant-Appellant

NO. 7939

(FC-D NO. 102059)

JUNE 22, 1982

BURNS, C.J., HEEN, J., AND CIRCUIT JUDGE CHUN ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY BURNS, C.J.

This case involves the Hawaii Uniform Child Custody Jurisdiction Act (HUCCJA), Hawaii Revised Statutes (HRS) chapter 583

(1976). Defendant-father appeals the lower court's custody award of their son Andrew to plaintiff-mother.[1] We generally affirm but partially reverse.

Father joined the United States Air Force in 1962. He and mother were married on July 16, 1965. Their son Timothy was born on April 28, 1966, and their son Andrew was born on February 5, 1969. In 1972 the family moved to Hawaii. On May 16, 1975, father and mother physically separated but both remained in Hawaii. The children lived with mother until December 1975 when they were sent to live with their maternal aunt in Florida. In September 1976 the children returned to Hawaii and lived with mother until December 19, 1976, when father assumed physical custody.

On May 31, 1977, father and mother entered into an "Agreement Incident to and in Contemplation of Divorce" (Agreement) which, in relevant part, provides as follows:

## IV.

Husband and Wife understand and recognize that they control the custody of their children only to the extent that their agreement coincides with such order as any court of competent jurisdiction may make for the best interests of such minors, but subject to such recognized premise of law, the Husband shall have the care, custody and control of the above named children during their minority, subject, however, to the right of the Wife to visit said children or have said children visit with her. Recognizing the fact that the husband is a career enlisted man in the United States Air Force and is subject to transfer by the Air Force from time to time, the Wife shall have unlimited visitation with the children while the Husband is stationed in Hawaii. In the event that the Husband is transferred from Hawaii, he shall pay for the round trip transportation of both of the children from his duty station to Hawaii during the months of July and August of each year, as the Wife may direct.

. . . . .

---

[1] A decree of a family court awarding child custody is final and appealable although questions of property division, child support, and spousal support are left for future determination. *Cleveland v. Cleveland,* 57 Haw. 519, 559 P.2d 744 (1977).

## VIII.

The Husband shall be solely responsible for the cost of the care, maintenance and education of each minor child above named until he attains the age of eighteen (18) years, or until he completes four (4) years study in a college or university or other high school educational institution mutually approved by the parties, whichever shall be the latter, but shall nevertheless terminate for each child upon his attaining the age of twenty-five (25) years, or upon his death or marriage if the same shall occur prior to the age eighteen (18), or completion of said four (4) years of post high school study.

In addition to the aforesaid provisions, the Husband shall maintain the children as beneficiaries under his life insurance policies and shall be solely responsible for their medical, hospital and dental care.

On June 16, 1977, the lower court issued a decree granting absolute divorce and awarding child custody which approved and incorporated the Agreement.

On December 3, 1977, father married a divorcee with custody of a son born February 11, 1975. Father's second wife, a full-time housewife/mother, gave birth to a son on November 18, 1978.

Father and his family moved to California in February 1979, and he stopped paying alimony.

Father did not send the boys to Hawaii in July 1979. Mother testified:

[MOTHER]: [H]e said that he would send them and then he started saying he didn't have any money. Then he said he had to go to North Carolina and then * * * he went to North Carolina for the month of July — * * * before he left for North Carolina I talked with him on the phone and he said that he was going to be transferred * * * he did not know where. And that * * * he would call me on the 1st day of August and make arrangements to send the boys to me. And then he didn't call me. And so, I called him and he didn't want to talk to me. And then he said he would not send the boys over and then the boys called me. * * * They called me on the 10th of August, "Mother, he won't let us come, please let us come" * * * And so I told him I will make arrangements * * * my ex-husband said he did not have the money. * * * So, the

next day I made arrangements. A friend of mine went to pick them up. It was all set, they were both coming to visit me. We knew they were going to Texas at that time and so my friend went — went to pick them up but between leaving Honolulu and arriving in Los Angeles, my oldest son called me and said he changed his mind, he did not want to come over * * *

Andrew arrived in Hawaii on August 11, 1979. In his answers to interrogatories father explained his actions: "I will do what I can afford. I live within a budget & with the constant rising costs & it gets more difficult to do anything that costs money. I cannot take from my family to satisfy [mother's] urges to see the children."

On or about August 14, 1979, mother phoned father and advised him that if he wanted Andrew back, he would have to come to Hawaii to get him and would have to pay the past due alimony. On or about August 17, 1979, father phoned mother "to say that he wanted Andy returned by August 21, 1979 because of the family's reassignment to Texas and the need to register Andy for school." Mother testified that on August 21, 1979, father's counsel called her "and said that they were going to come get me and they were going to take Andy away and Andy and I were scared. . . . So Andy and I hid. We ran away. And that's when Andy started deciding that he didn't want to go back and he wanted to stay here with me." Sometime between August 17, 1979, and September 12, 1979, father and family moved to Texas.

On September 12, 1979, father filed an Order to Show Cause After Order or Decree (OSCAOD) to compel Andrew's return and to terminate alimony. On September 19, 1979, mother filed an OSCAOD for custody of Andrew, for child support of $150 per month, for contempt for father's failure to pay alimony, to set aside the Agreement on the grounds that father had no intention to abide by the Agreement once he left Hawaii and thus fraudulently induced her to enter into it and for an award of a portion of father's probable military retirement benefits.

On October 11, 1979, the lower court issued an order for social study. On November 29, 1979, the Texas Department of Human Resources reported favorably on father's situation in Texas. On January 29, 1980, the Adult Services Branch of Hawaii's First Circuit Family Court noted Andrew's expressed desire to remain in Hawaii with mother and recommended that Andrew be placed in mother's

custody subject to father's reasonable rights of visitation.

On April 3, 1980, a hearing was held on the child custody issue only. Father was not present at the hearing but was represented by counsel and his answers to interrogatories were received in evidence.

On May 8, 1980, the lower court issued a Decision and Order which, *inter alia,* "ORDERED, ADJUDGED AND DECREED as follows:"

1. [Mother] is awarded the permanent legal custody of the minor child, ANDREW McNIEL BULLARD, with [father] to be entitled to reasonable rights of visitation for a period of not less than six (6) weeks per year with rights of visitation restricted as follows:

(a) [Father] must execute a document prepared by [mother] stating that [father] promises to return Andrew to [mother] in Hawaii or her home state at that time on a date certain, as agreed upon by the parties, with [father] acknowledging said state as the minor's home state, agreeing that no legal action will be taken by [father] in any jurisdiction other than said state, and that failure to return Andrew to [mother] in said state on the agreed-upon date will constitute misconduct justifying contempt of Court and, upon proper showing, will be sufficient cause for an immediate order of contempt to be issued by the Court or other appropriate judicial action;

(b) [Father] must also post a $2,500 bond with the Chief Clerk of the First Circuit Court, State of Hawaii, prior to each visitation with provision for the bond to be released to [mother] and forfeited by [father] in the event [father] does not return physical custody of the child to [mother] on the date agreed upon in writing.

On appeal father asserts four points of error. We will deal with them seriatum.

## I.

Father contends that the trial court erred when it decided that it had jurisdiction to change Andrew's custody. We disagree.

We also disagree with mother's response that jurisdiction is supplied by HRS § 571-46(6) (1976). That statute, which provides in

relevant part that "[a]ny custody award shall be subject to modification or change whenever the best interests of the child require or justify the modification or change. . .," deals with the *res judicata* issue. *Cf. Saromines v. Saromines*, 3 Haw. App. 20, 641 P.2d 1342 (1982) (which deals with spousal support). If that statute ever supplied jurisdiction, that fact was changed by the 1973 enactment of the HUCCJA, which, until the enactment of the Parental Kidnapping Prevention Act,[2] exclusively governed Hawaii's jurisdiction in custody cases.[3] *Griffith v. Griffith*, 60 Haw. 567, 592 P.2d 826 (1979).

We further disagree with mother's contention that jurisdiction is supplied by HUCCJA § 583-3(a)(1):

§ 583-3 *Jurisdiction.* (a) A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(1) This State (A) is the home state of the child at the time of commencement of the proceeding, or (B) had been the child's home state within six months before commencement of the proceeding and the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this State; or * * *

Section 583-2(5) of the HUCCJA defines "home state" as follows:

§ 583-2 *Definitions.* As used in this chapter: * * *

(5) "Home state" means the state in which the child immediately preceding the time involved lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six-month or other period; * * *

Subject matter jurisdiction in a custody case is determined as of the time the petition is filed. *In Re Sagan*, 261 Pa.Super.Ct. 384, 396 A.2d 450 (1978). Mother filed her OSCAOD on September 19, 1979. The question, therefore, is whether Hawaii was Andrew's

---

[2] Public Law 96-611, effective December 28, 1980, gave nation-wide effect to the basic jurisdictional provisions of the Uniform Child Custody Jurisdiction Act.

[3] If *Blackshear v. Blackshear*, 52 Haw. 480, 478 P.2d 852 (1971), supplied jurisdiction, that was also changed by the enactment of the HUCCJA.

"home state" on September 19, 1979. The answer is no because Andrew had not lived in Hawaii for the six months immediately preceding September 19, 1979.

Mother's final contention is that jurisdiction is supplied to Hawaii by HUCCJA §§ 583-3(a)(2), (3), or (4):

§ 583-3 Jurisdiction. (a) A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if: * * *

(2) It is in the best interest of the child that a court of this State assume jurisdiction because (A) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (B) there is available in this State substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or

(3) The child is physically present in this State and (A) the child has been abandoned or (B) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

(4) (A) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (1), (2), or (3), or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (B) it is in the best interest of the child, that this court assume jurisdiction. * * *

We conclude that California and Texas would abuse their discretion if they held that they had jurisdiction under their counterparts to (1), (2), or (3) and that Hawaii has jurisdiction under HUCCJA § 583-3(a)(4).[4]

---

[4] Query whether Hawaii also has jurisdiction under the amorphous provisions of section 583-3(a)(2). The facts show that Hawaii has been mother's domicile since 1972; that Andrew was born on February 5, 1969; that he lived in Hawaii from 1972 to December 1975 and then from September 1976 to February 1979; that he returned to Hawaii on August 11, 1979, and was here on September 19, 1979; and that on June 16, 1977, Hawaii issued the divorce decree which placed Andrew in father's

California may have become Andrew's "home state" prior to August 11, 1979, since he and father were living in California since "February, 1979." However, prior to September 19, 1979, father and his family moved to Texas, thereby terminating California's home state status, if any, *Griffith, supra.*, severing California's "significant connection" and eliminating the availability in California of "substantial evidence concerning the child's present or future care."

Texas was never a "home state." Prior to the Hawaii Supreme Court's decision in *Allen v. Allen,* 2 Haw. App. 519, 634 P.2d 609 (1981), *rev'd,* 64 Haw. 553, 645 P.2d 300 (1982), we might have decided that Texas had jurisdiction under its statute parallel to 583-3(a)(2)[5] because it was Andrew's legal custodian's domicile at the time mother filed her petition. However, since domicile is not a "significant connection" and since the parents and child in this case have less connection with Texas than the parents and child in *Allen* had with Hawaii, or the parents and child in *Griffith* had with California, *Allen* and *Griffith* preclude us from doing so.[6]

## II.

Father contends that the lower court abused its discretion when it exercised jurisdiction and did not require mother to go to Texas to seek custody. We disagree.

§ 583-7 Inconvenient forum. (a) A court which has jurisdiction under this chapter to make an initial or modification decree may decline to exercise its jurisdiction any time before

---

custody. *Griffith's* holding that California did not have 3(a)(2) type jurisdiction under the facts in that case causes us some doubt whether Hawaii has 3(a)(2) type jurisdiction under the facts in this case.

[5] V.T.C.A., Family Code Sec. 11.045(a)(2) (1975, as amended).

[6] *Griffith* said that decisions determining the existence of jurisdiction under HUCCJA section 583-3(a)(2) are "judgmental" but it held that they are discretionary and shall not be disturbed on appeal absent manifest abuse thereof. Yet, when *Griffith* affirmed the lower court's decision that it had jurisdiction to modify California's custody decree, it necessarily decided (because of HUCCJA section 583-14(a)) that California did not have jurisdiction under its counterpart to HUCCJA section 583-3(a)(2). Thus, *Griffith* necessarily held that it would have been a manifest abuse of discretion for California to decide that it had jurisdiction.

making a decree if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum. * * *

Hawaii could decline to exercise its jurisdiction only if another state with jurisdiction were a more "convenient" forum. Here, no other state had jurisdiction. In addition, the Uniform Child Custody Jurisdiction Act § 14(a) indicates a preference for the state which issued the initial decree to determine applications for modification if it has jurisdiction to do so. *Larsen v. Larsen*, 5 Kan. App.2d 284, 615 P.2d 806 (1980).

Father further argues that the lower court should have refused to exercise jurisdiction because mother "improperly retained the child after a visit." Admittedly, HUCCJA § 583-8(b) specifies that "the court shall not exercise its jurisdiction to modify a custody decree of another state" in such circumstances. However, that section does not apply to a custody decree of the same state. Moreover, HUCCJA § 583-8(b) also specifies that jurisdiction should be exercised if "required in the interest of the child." The lower court's decision on this issue was a matter of discretion which we will not disturb absent a manifest abuse thereof. *Griffith, supra.*

### III.

Father contends that the trial court abused its discretion when it changed Andrew's custody. We find no merit in this contention.

### IV.

Father contends that the trial court abused its discretion when it imposed the preconditions to the exercise of visitation by father. We affirm the bond requirement but reverse the requirement that father execute a promissory document.

The discretionary power of the Hawaii family court in a custody case to require a non-resident parent being visited by his or her resident child in some place other than Hawaii to execute a bond conditioned upon a return of the child to Hawaii in accordance with the orders of the court is beyond question. 24 AM. JUR.2d *Divorce*

*and Separations* § 782 (1966).[7] However, since child-parent visitation usually is in the best interest of the child, whereas the effect of such a requirement is to inhibit or discourage such visitation, we view such bond requirements with disfavor. Moreover, we prefer not to initiate or to fuel a war between the states over out-of-state parent-child visitation. Consequently, we think the family court should require such a bond only if it decides that there is a substantial likelihood that its order will be violated absent the bond. Additionally, the terms of the bond must be reasonable under the circumstances. The appellate standard of review is whether the family court abused its discretion when it required the bond and when it decided its terms.

The following facts support the requirement of a bond in this case:

1. When Andrew was in father's custody in Hawaii, father punished him for his unsatisfactory school work by refusing to allow him to visit with mother on a Sunday.

2. Father's threat to mother after she required him to come to Hawaii to obtain Andrew's return: "[O]nce I get Andy back, you'll never see either boy again."

3. Father's refusal to give mother and Andrew his home telephone number in Texas.

4. Father's failure to comply with the lower court's consent decree which incorporated his agreement concerning visitation.

With respect to the reasonableness of the terms of the bond, it is father's burden on appeal to show facts in the record supporting his claim of unreasonableness and he failed to do so.

With respect to the form and content of the document which the lower court required father to execute, we generally disapprove. Although we do not disagree with requiring father to acknowledge the specifics of the court order, his understanding of when and where he is obligated to return the child, and his understanding of the possible penalties for non-compliance, we disapprove of the requirement that he agree not to institute legal action except in

---

[7] We note that this bond specifies that upon forfeit the proceeds go to mother. Presumptively she would then use the proceeds to pay for fees and costs incurred in attempting to obtain compliance with the court's order.

Hawaii, to "promise" to obey the court's order, and to stipulate that non-compliance constitutes grounds for a finding of contempt. The law of contempt does not require the father to guarantee a result. It requires him to exert due diligence to comply with the court's order whether or not he promises to do so and he is liable for sanctions if he does not. The law decides what is and what is not contempt and the court cannot create contempt before the fact or where none exists. Moreover, the court may not deal summarily with indirect[8] contempt. *State v. Ryan,* 59 Haw. 425, 583 P.2d 329 (1978). Finally, the court cannot create an additional offense for the violation of its order which is what it appears to be trying to do.

We affirm the lower court's Decision and Order of May 8, 1980, except as to paragraph 1(a) which, on remand, shall be amended to conform to the requirements of this opinion or stricken from the Decision and Order.

*Hayden F. Burgess* on the briefs for defendant-appellant.

*Ronald J. Endrizal* on the briefs for plaintiff-appellee.

---

[8] "Contempts of court are classified as direct and as indirect, the test being whether the contempt is offered within or outside the presence of the court." 17 AM. JUR.2d *Contempt* § 6 (1964).