Shannon B. CATLIN, n/k/a Shannon
B. Klein, Plaintiff and Appellee,

v.

Joseph F. CATLIN, Defendant
and Appellant.

Civ. No. 920167.

Supreme Court of North Dakota.

Dec. 23, 1992.

Richard R. LeMay (argued), Legal Assistance of North Dakota, Minot, for plaintiff and appellee.

Robert S. Rau (argued), of Bosard, McCutcheon & Rau, Ltd., Minot, for defendant and appellant. Appearance by appellant Joseph F. Catlin.

JOHNSON, Justice.

Joseph Catlin appeals from a divorce judgment awarding custody of the parties'

son, Christopher, to Shannon Catlin. We affirm.

Joseph and Shannon were married in North Dakota on June 4, 1987. Joseph was in the Air Force, stationed at the Minot Air Force Base. Christopher was born in Minot on July 23, 1988. The family lived in North Dakota until July 1989, when Joseph was transferred to Turkey. En route to Turkey, Joseph, Shannon, and Christopher spent several weeks in Canton, New York, visiting Joseph's parents. Joseph proceeded to Turkey, and Shannon and Christopher followed upon receiving their passports approximately two weeks later.

The family lived together at Incirlik Air Force Base in Turkey for approximately nine months. The marriage grew increasingly strained and Shannon decided to return to North Dakota. Although she wanted to take Christopher with her, she was told by military authorities that Christopher could not leave Turkey without Joseph's authorization. When Joseph refused to consent to Christopher's departure with Shannon, she returned to North Dakota alone in March 1990.

On August 6, 1990, Shannon commenced this divorce action in the District Court of Ward County. Joseph was served by certified mail in Turkey. On August 23, 1990, the court received a letter from Joseph requesting a stay of the proceedings pursuant to the Soldiers' and Sailors' Civil Relief Act. On October 31, 1990, Shannon filed an application for temporary custody after learning that military dependents were being moved out of Turkey because of rising tensions in the Middle East region, incident to the subsequent war with Iraq.

On November 6, 1990, the court issued an order denying Joseph's request for a stay, and issued an interim order awarding temporary custody to Shannon and ordering Joseph to return Christopher to North Dakota. Shannon attempted to serve the orders upon Joseph by certified mail. He refused delivery on December 27, 1990.

Shannon was unaware that Joseph had traveled to England in October 1990 to deliver Christopher to Joseph's parents, Roger and Barbara Catlin. Christopher then returned with his grandparents to Canton, New York. Throughout late 1990 and early 1991, as military conflict in the Middle East became a reality, Shannon attempted to learn of Christopher's location. Roger and Barbara Catlin told Shannon in numerous telephone conversations that they did not know where Christopher was, when in fact he was living with them in New York. In several letters, Joseph left the impression that Christopher was still living in Turkey. Finally, in March 1991, Shannon learned through Senator Quentin Burdick's office that Christopher was living with Roger and Barbara in New York.

Shannon obtained counsel in New York and sought enforcement of the interim custody order. The New York Family Court held that North Dakota was Christopher's "home state" and had subject matter and personal jurisdiction to determine custody. Noting that a hearing was scheduled in Ward County for July 1, 1991, the New York court stated that it would retain jurisdiction only until the scheduled hearing took place, and further ordered that Christopher be returned to North Dakota for the hearing.

Joseph was discharged from the Air Force on June 30, 1991, and he appeared at the scheduled hearing in Ward County the next day. He did not, however, bring Christopher back to North Dakota. At the July 1 hearing, Joseph asserted that the court lacked subject matter and personal jurisdiction. The court held that it had subject matter and personal jurisdiction, and it again ordered that Christopher be returned to North Dakota, with temporary custody awarded to Shannon. Christopher was finally returned to Shannon in North Dakota on July 14, 1991.

The trial was held on August 14. At the conclusion of the hearing, the court ordered a divorce but delayed its ruling on custody pending the outcome of psychological testing. At a hearing on February 5, 1992, a court-appointed psychologist offered his opinion that custody should be awarded to Shannon. Two expert witnesses retained by Joseph, a psychologist and a professor in social work, concluded that

both Shannon and Joseph would be fit custodians for Christopher and recommended joint custody. The trial court awarded custody to Shannon. Judgment was entered on April 13, 1992, and Joseph appealed.

Only custody and related issues are challenged on appeal. The essential issues are:

(1) Did the trial court's allegedly erroneous refusal to stay the proceedings prejudicially affect the decision on permanent custody?

(2) Did the trial court properly exercise personal and subject matter jurisdiction?

(3) Were the trial court's findings of fact on custody clearly erroneous?

(4) Did the trial court err in failing to award extended summer visitation?

## I

Joseph asserts that the trial court abused its discretion in denying his request for a stay, and the court's error prejudicially affected the final decision on custody.

■ Joseph requested a stay under the Soldiers' and Sailors' Civil Relief Act of 1940.

> "At any stage thereof any action or proceeding in any court in which a person in military service is involved, either as plaintiff or defendant, during the period of such service or within sixty days thereafter may, in the discretion of the court in which it is pending, on its own motion, and shall, on application to it by such person or some person on his be-

half, be stayed as provided in this Act [sections 501 to 591 of this Appendix] unless, in the opinion of the court, the ability of plaintiff to prosecute the action or the defendant to conduct his defense is not materially affected by reason of his military service." 50 U.S.C. App. § 521.

The Act leaves it within the trial court's discretion to determine whether a service member's ability to defend or prosecute will be materially affected by his or her service. *Boone v. Lightner,* 319 U.S. 561, 565–570, 63 S.Ct. 1223, 1226–1228, 87 L.Ed. 1587, 1591–1593 (1943).

■ Even if we assume that the trial court abused its discretion in denying Joseph's request for a stay,[1] Joseph has failed to show how that error affected the ultimate decision on custody.[2] Joseph's argument is essentially twofold: (1) The trial court was biased against Joseph because of his attempt to invoke the stay provisions; and, (2) The denial of the stay led to an unjust interim order which was ultimately adopted by the court as its final determination on custody.

Joseph attempts to support his assertion of trial court bias upon one short reference in the transcript in which the court noted that "there has been a lot of dillydally, there's been lots of circumvention here, letters unanswered and things like that." There is no reference, however, to Joseph's attempt to invoke the stay provisions of the Act, and it is clear that the "dillydally" and "circumvention" cited by the court related to the actions of Joseph and his parents in

---

1. Joseph's request for a stay stated:
 "Due to my current military obligation in Turkey, my ability to conduct a defense is materially affected. A stay in these proceedings should be granted in accordance with 50 U.S.C.A.App. 521 (The Soldiers' and Sailors' Civil Relief Act of 1940). This correspondence is for the sole and limited purpose of asserting my rights under the Act."
 The United States Supreme Court has noted that the Act does not automatically require a stay upon a mere showing that the defendant was engaged in military service. *Boone v. Lightner,* 319 U.S. 561, 565, 63 S.Ct. 1223, 1226, 87 L.Ed. 1587, 1591 (1943). *See also Hackman v. Postel,* 675 F.Supp. 1132, 1133–1134 (N.D.Ill.1988); *Hibbard v. Hibbard,* 230 Neb. 364, 431 N.W.2d 637, 639–640 (1988); *Palo v. Palo,* 299 N.W.2d

577, 579 (S.D.1980); *Power v. Power,* 720 S.W.2d 683, 684–685 (Tex.Ct.App.1986). *Contra Mays v. Tharpe & Brooks, Inc.,* 143 Ga.App. 815, 240 S.E.2d 159, 160–161 (1977). However, because we conclude that Joseph has not established that the court's refusal to grant a stay affected its ultimate decision on custody, it is unnecessary to base our decision on application of the federal statute.

2. Joseph did not seek a Rule 54(b), N.D.R.Civ.P., certification of the order denying a stay or otherwise attempt an immediate appeal. Nor does Joseph now seek any affirmative relief from that order. Rather, Joseph raises the order only in the context of its effect upon the trial court's ultimate decision to award custody to Shannon.

concealing Christopher's location from Shannon for nearly a year. The court's memorandum opinion clarifies the court's concerns, stressing that the "clandestine exchange" of the child in Europe and the grandparents' holding of the child "incommunicado" demonstrated a "perverse alliance to separate the boy from his mother which could continue" if Joseph received custody. It was not Joseph's attempt to invoke the Act or the interim order which influenced the court's ultimate decision on custody, but rather the conduct of Joseph and his parents.

 Joseph also asserts prejudice in the denial of the stay and the subsequent issuance of an interim custody award because, as we recognized in *Odegard v. Odegard*, 259 N.W.2d 484, 485–486 (N.D.1977), "temporary-custody orders have a tendency to become permanent-custody orders." We stressed in *Odegard*, however, that a substantial reason for that phenomenon is concern for the physical and psychological stability of the child. One parent's custody of the child while the divorce is pending may result in the creation of emotional bonds and security in one's surroundings which are desirable to perpetuate in the permanent custody order.

The facts in this case demonstrate that no such stability was created as a result of the interim order. Joseph ignored the court's interim order to return Christopher to Shannon, and instead secreted the child at his parents' home in New York. Because Joseph did not comply with the interim order, Shannon was not allowed to establish the stability with Christopher during the pendency of the divorce action which could have become a factor in the court's final custody determination. Joseph's assertion that the interim order would have a tendency to affect the determination of permanent custody is unpersuasive.

**3.** Joseph does not assert that the case belongs in the Turkish courts. Rather, Joseph seeks a determination that the North Dakota court lacked jurisdiction, thereby allowing New York to exer-

II

Joseph asserts that the trial court lacked both subject matter jurisdiction and personal jurisdiction to hear this case.

## A. SUBJECT MATTER JURISDICTION

 A district court's subject matter jurisdiction to adjudicate an interstate child custody dispute in an initial divorce proceeding is governed by the Uniform Child Custody Jurisdiction Act [UCCJA] (Chapter 14–14, N.D.C.C.) and is also affected to some extent by the Parental Kidnapping Prevention Act [PKPA] (28 U.S.C. § 1738A). *Byzewski v. Byzewski*, 429 N.W.2d 394, 398 (N.D.1988). Joseph asserts that New York, rather than North Dakota, was the appropriate state to adjudicate custody under the jurisdictional provisions of the UCCJA and the PKPA.[3]

The relevant UCCJA provision is Section 14–14–03(1), N.D.C.C. [UCCJA § 3(a) ]:

"1. A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial decree or modification decree if:

&ast; &ast; &ast; &ast; &ast; &ast;

"b. It is in the best interest of the child that a court of this state assume jurisdiction because (1) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (2) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

&ast; &ast; &ast; &ast; &ast; &ast;

"d. (1) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with subdivision a, b, or c, or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (2) it is in the

cise jurisdiction. The case thus boils down to which state, North Dakota or New York, was the proper state to assume jurisdiction under the UCCJA and PKPA.

best interest of the child that this court assume jurisdiction."

The PKPA provision (28 U.S.C. § 1738A(c)) contains similar standards:

"(c) A child custody determination made by a court of a State is consistent with the provisions of this section only if—

"(1) such court has jurisdiction under the law of such State; and

"(2) one of the following conditions is met:

\* \* \* \* \* \*

"(B)(i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

\* \* \* \* \* \*

"(D)(i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; ..."

The trial court, in a well-reasoned and thoughtful opinion, concluded that it had jurisdiction under those provisions. The court found that Shannon and Christopher had significant connections with North Dakota; that evidence of Christopher's care, protection, training, and relationships was available in North Dakota; that no other state had jurisdiction; that New York had declined to exercise jurisdiction; and that it was in Christopher's best interests that North Dakota assume jurisdiction.

In analyzing the jurisdictional question, we first note that the vast majority of courts have held that, under the UCCJA jurisdiction provisions, the criteria supporting jurisdiction are to be viewed as they existed at the time the particular custody proceeding was commenced. *See, e.g., Rexford v. Rexford,* 631 P.2d 475, 478 (Alaska 1980); *Bullard v. Bullard,* 3 Haw.App. 194, 647 P.2d 294, 299 (1982); *Bull v. Bull,* 109 Mich.App. 328, 311 N.W.2d 768, 774 (1981); *State ex rel. Laws v. Higgins,* 734 S.W.2d 274, 278 (Mo.Ct.App.1987); *Mark L. v. Jennifer S.,* 133 Misc.2d 454, 506 N.Y.S.2d 1020, 1023 (Fam.Ct.1986); *State ex rel. Cooper v. Hamilton,* 688 S.W.2d 821, 823 (Tenn.1985); *State in Interest of D.S.K.,* 792 P.2d 118, 125 n. 6 (Utah Ct. App.1990); *Peloso v. Botkin,* 144 Vt. 461, 479 A.2d 156, 158 (1984). *Dragoo v. Dragoo,* 99 Wis.2d 42, 298 N.W.2d 231, 232 (Ct.App.1980). *Compare Plas v. Superior Court,* 155 Cal.App.3d 1008, 202 Cal.Rptr. 490, 494 n. 5 (1984) ("the better rule is that subject matter jurisdiction either exists or does not exist at the time the action is commenced"), *with In re Marriage of Hopson,* 110 Cal.App.3d 884, 168 Cal.Rptr. 345, 353 (1980) (significant date for determining jurisdiction is the date of the hearing).

This principle is merely a restatement of the broader general rule that a court's acquisition of jurisdiction over a case depends upon the facts existing at the time its jurisdiction is invoked. *State ex rel. Laws v. Higgins, supra,* 734 S.W.2d at 278; *see* 20 Am.Jur.2d Courts § 142 (1965). Subject matter jurisdiction either exists or does not exist at the time the proceeding is commenced, and facts developing thereafter while the action is pending cannot affect the existence of subject matter jurisdiction under the UCCJA and PKPA. *See Rexford v. Rexford, supra,* 631 P.2d at 478; *Bull v. Bull, supra,* 311 N.W.2d at 774; *State ex rel. Laws v. Higgins, supra,* 734 S.W.2d at 278; *Peloso v. Botkin, supra,* 479 A.2d at 158.

Joseph asserts that, under *Dennis v. Dennis,* 366 N.W.2d 474 (N.D.1985), North Dakota must "currently" meet the jurisdictional requirements of Chapter 14–14,

N.D.C.C. Joseph misconstrues *Dennis.* *Dennis* was a modification case in which the original divorce decree and custody order were entered in North Dakota. The mother and children subsequently moved to Iowa. Nearly three years later, the father sought modification of the custody order in North Dakota. The Chief Justice concluded that, in order to exercise jurisdiction to modify custody, the court had to "currently" meet the jurisdictional requirements of Section 14–14–03(1), N.D.C.C. *Dennis v. Dennis, supra,* 366 N.W.2d at 476. However, the use of the term "currently" did not imply that the jurisdictional factors must exist at the time of the hearing or at the time of the appeal. It was intended to clarify that the court had to have jurisdiction under Section 14–14–03(1), N.D.C.C., at the time the modification proceedings were commenced, and that its prior exercise of jurisdiction in the original divorce proceedings did not "carry over" to the subsequent modification proceedings. *See State ex rel. Cooper v. Hamilton, supra,* 688 S.W.2d at 823. *Dennis* does not hold that jurisdictional facts occurring during the pendency of the proceeding can divest the court of subject matter jurisdiction, and it does not conflict with the cases holding that subject matter jurisdiction either exists or does not exist at the time the action is commenced.

We look to the facts as they existed on August 6, 1990, the date Shannon commenced the action seeking custody, to determine whether the district court had jurisdiction under the UCCJA and PKPA. The court concluded that the jurisdictional requisites of Section 14–14–03(1)(b) and (d), N.D.C.C., and 28 U.S.C. § 1738A(c)(2)(B) and (D) had been met. Under Section 14–14–03(1)(b) and 28 U.S.C. § 1738A(c)(2)(B), the court must determine that the child and one parent have significant connections with the state; that evidence concerning the child's care, protection, training, and relationships is available in the state; that no other state is the "home state"; and that exercise of jurisdiction is in the child's best interests. Under Section 14–14–03(1)(d) and 28 U.S.C. § 1738A(c)(2)(D), the court must determine that no other state has jurisdiction under the UCCJA and PKPA standards, or that another state has declined to exercise jurisdiction, and that exercise of jurisdiction in this state is in the child's best interests.

Comparing the competing factors supporting jurisdiction between North Dakota and New York as they existed on August 6, 1990, it is clear that the district court properly exercised jurisdiction. Christopher was conceived and born in North Dakota. The family lived here for more than two years. In fact, North Dakota was the *only* state in which Christopher had ever resided. Shannon was a life-long resident of North Dakota, and returned here after leaving Turkey.

Conversely, Christopher's contacts with New York on August 6, 1990, were virtually nonexistent. He had visited his grandparents there briefly with his parents on two occasions. He had never lived there. There was virtually no evidence available there regarding his care, protection, training, or relationships. On August 6, 1990, neither Christopher nor Joseph was present in New York. It is hard to imagine any basis for a determination that New York had jurisdiction to entertain an action for Christopher's custody under the UCCJA and PKPA on that date. The New York Family Court clearly recognized as much when it subsequently declined to exercise jurisdiction.

■ Among the stated purposes of the UCCJA is promotion of cooperation with courts of other states so that custody decrees are rendered in the state which can best decide the case in the interest of the child, and assurance that custody determinations be made by courts in the state with which the child and his family have the closest connection and where significant evidence regarding the child's care, protection, training, and personal relationships is most readily available. Section 14–14–01(1)(b) and (c), N.D.C.C. [UCCJA § 1]. Here, North Dakota clearly had the closest connections with the child and his family, and evidence was most readily available here. Furthermore, Section 14–14–03(3), N.D.C.C. [UCCJA § 3(c) ], specifically provides that the presence of the child within

the state is not required for a court to validly assume jurisdiction. We conclude that the jurisdictional requisites have been satisfied, and the district court had subject matter jurisdiction.

Joseph argues that, because Christopher was physically present in New York from October 1990 until shortly before the trial in August 1991, New York had acquired the more significant connections with the child, evidence was more readily available there, and New York had become the "home state." *See* Section 14–14–03(1), N.D.C.C. [UCCJA § 3(a) ]; N.Y.Dom.Rel. Law § 75–d(1) (McKinney 1988); 28 U.S.C. § 1738A(c). However, facts occurring after the commencement of the action are irrelevant for purposes of determining jurisdiction under the UCCJA and PKPA. *See, e.g., Peloso v. Botkin, supra,* 479 A.2d at 158. As noted in *Bull v. Bull, supra,* 311 N.W.2d at 774, "[t]here is nothing in the [UCCJA] which would indicate that jurisdictional requirements may be established during the pendency, as opposed to the commencement, of the proceedings." *See also State ex rel. Laws v. Higgins, supra,* 734 S.W.2d at 278. The court in *Plas v. Superior Court, supra,* 202 Cal.Rptr. at 494 n. 5, noted that this was precisely the type of case for which the rule was intended, "[o]therwise the absconding parent is encouraged purposely to delay a pending custody proceeding in order to gain time to establish significant contact with [another] state."

Allowing New York to acquire a jurisdictional basis from Christopher's presence there would directly thwart the public policy underpinnings of the UCCJA and PKPA. Both Acts were intended to deter forum shopping and shifting of children from state to state. *See* Section 14–14–01(1)(a), N.D.C.C. [UCCJA § 1(a)(1) ]. They also

were intended to "[d]eter abductions and other unilateral removals of children undertaken to obtain custody awards." Section 14–14–01(1)(e), N.D.C.C. [UCCJA § 1(a)(5) ].

Any significant connections which Christopher developed with New York are the result of his presence there from October 1990 to July 1991. Christopher was present in New York only because Joseph willfully violated the interim order awarding custody to Shannon,[4] and then conspired with his parents to hide Christopher from Shannon for nearly a year. It would make a mockery of the UCCJA and PKPA to transform Christopher's fraudulently obtained presence in New York into a basis for exercise of custody jurisdiction by a court of that state.[5]

We conclude that the district court properly exercised subject matter jurisdiction under the UCCJA and PKPA.

## B. PERSONAL JURISDICTION

▮▮▮ Joseph asserts that the trial court lacked personal jurisdiction over Christopher and him to determine the issue of custody. Joseph does not, however, challenge the court's authority to order a divorce, recognizing the "divisible divorce" doctrine. Under that theory, which we endorsed in *Smith v. Smith,* 459 N.W.2d 785, 787–788 (N.D.1990), and *Byzewski v. Byzewski,* 429 N.W.2d 394, 397 (N.D.1988), it is recognized that dissolution of the marriage is an *in rem* proceeding affecting status, and the court need not have personal jurisdiction over both spouses.

We first note that the court did not need personal jurisdiction over Christopher. The child is not a proper party to the divorce action, and accordingly need not be served. Prior to the divorce action, each

**4.** Joseph's specific refusal to accept delivery of the interim custody order constituted completed service under Rule 4(k), N.D.R.Civ.P.:

"*(k) Effect of Mail Refusal.* If a summons and complaint or other process is mailed with delivery restricted and requiring a receipt signed by the addressee, the addressee's refusal to accept the mail constitutes delivery. Return of the mail bearing an official indication on the cover that delivery was refused by the

addressee is prima facie evidence of the refusal."

**5.** Under different circumstances, a court of this state would be authorized to decline to exercise jurisdiction if another state has become the child's home state or acquired the more significant connections during the pendency of the action. *See* Section 14–14–07, N.D.C.C. [UCCJA § 7].

parent is entitled equally to custody of an unmarried minor child. Section 14–09–04, N.D.C.C. Section 14–05–22, N.D.C.C., authorizes the court to award custody of the minor child in the divorce action. The UCCJA specifically recognizes that the presence of the child within the state is not a prerequisite to a valid custody decree. Section 14–14–03(3), N.D.C.C. [UCCJA § 3(c)]. Joseph cites no authority for his assertion that personal jurisdiction over Christopher was a prerequisite to a valid custody order incidental to the divorce. It is unnecessary to determine that the court had personal jurisdiction over Christopher.

■ We recognize that whether a court of this state must have personal jurisdiction over a nonresident spouse in order to make a valid award of child custody under the UCCJA and PKPA has not been specifically resolved by this court.[6] Because we conclude that the trial court clearly had acquired personal jurisdiction over Joseph under the long-arm provisions of Rule

---

**6.** In *Byzewski v. Byzewski, supra,* 429 N.W.2d at 398, we noted that "whether constitutional due process requires that a court in a divorce action have personal jurisdiction over a nonresident spouse in order to make a valid child custody award is far from settled." We also noted that the drafters of the UCCJA specifically stated that personal jurisdiction was not required. *Byzewski v. Byzewski, supra,* 429 N.W.2d at 398, *quoting* UCCJA § 12, Official Comment, 9 U.L.A. 274 (Part I, 1988). We found it unnecessary to resolve the issue in that case, because we concluded that the state court lacked subject matter jurisdiction over the child custody dispute.

In *Smith v. Smith,* 459 N.W.2d 785 (N.D. 1990), we briefly commented on the personal jurisdiction required in custody cases. In *Smith,* the husband brought a divorce action in North Dakota. His wife lived in Pennsylvania, had never lived in North Dakota, and had absolutely no connections to this state other than the fact that her husband had moved here. Although the parties had a minor child, custody apparently was not a contested issue. The child had lived with the wife for many years after the husband moved out to follow his employment to various locales.

We reversed the judgment, other than the dissolution of the marriage, because of lack of personal jurisdiction over the wife. In so doing, we mentioned briefly that personal jurisdiction was required to determine "rights to child custody." *Smith v. Smith, supra,* 459 N.W.2d at 788–789. *Smith* is a highly unusual case, however, in that custody was not contested and the nonresident spouse apparently retained custody of the child. Accordingly, we found it unnecessary to address the delicate interplay between personal jurisdiction, due process, and the jurisdictional provisions of the UCCJA and PKPA.

As previously noted, the drafters of the UCCJA did not envision that "technical personal jurisdiction" was required in custody actions, because "custody determinations, as distinguished from support actions . . . are proceedings in rem or proceedings affecting status." UCCJA § 12, Official Comment, 9 U.L.A. 274 (Part I, 1988). *See also Byzewski v. Byzewski, supra,* 429 N.W.2d at 398. We have previously held, of course, that it is the in rem or status-affecting nature of divorce proceedings which allows the court, under the "divisible divorce" theory, to dissolve the marriage without personal jurisdiction over the nonresident spouse. *Smith v. Smith, supra,* 459 N.W.2d at 787–788.

The overwhelming majority of courts which have considered the issue under the UCCJA have concluded that child custody actions are in rem proceedings affecting status, and accordingly a court determining custody under the Act need not acquire personal jurisdiction over a nonresident spouse. *See In re Marriage of Leonard,* 122 Cal.App.3d 443, 175 Cal.Rptr. 903, 906–912 (1981); *Goldfarb v. Goldfarb,* 246 Ga. 24, 268 S.E.2d 648, 650–651 (1980); *In re Marriage of Bueche,* 193 Ill.App.3d 594, 140 Ill.Dec. 566, 569, 550 N.E.2d 48, 51 (1990); *In re Marriage of Schuham,* 120 Ill.App.3d 339, 76 Ill.Dec. 159, 163–64, 458 N.E.2d 559, 563–564 (1983); *In re Marriage of Hudson,* 434 N.E.2d 107, 117–119 (Ind.Ct.App.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 433 (1983); *Warwick v. Gluck,* 12 Kan.App.2d 563, 751 P.2d 1042, 1045 (1988); *Martinez v. Reed,* 490 So.2d 303, 306 (La.Ct.App.1986); *Genoe v. Genoe,* 205 N.J.Super. 6, 500 A.2d 3, 7–8 (App.Div.1985); *Hart v. Hart,* 74 N.C.App. 1, 327 S.E.2d 631, 635 (1985); *Pratt v. Pratt,* 431 A.2d 405, 409 (R.I. 1981); *In Interest of S.A.V.,* 798 S.W.2d 293, 298 (Tex.Ct.App.1990); *Hudson v. Hudson,* 35 Wash. App. 822, 670 P.2d 287, 293 (1983); *McAtee v. McAtee,* 174 W.Va. 129, 323 S.E.2d 611, 617 (1984). *See also* Garfield, *Due Process Rights of Absent Parents in Interstate Custody Conflicts,* 16 Ind.L.Rev. 445 (1983); Weintraub, *Affecting the Parent–Child Relationship Without Jurisdiction Over Both Parents,* 36 Sw.L.J. 1167 (1983); Comment, *Jurisdiction Over the Nonresident Parent in a Suit Affecting the Parent–Child Relationship,* 34 Baylor L.Rev. 107 (1982).

Apparently only three states have reached the opposite conclusion. *See Ex parte Dean,* 447 So.2d 733, 735 (Ala.1984); *Pasqualone v. Pasqualone,* 63 Ohio St.2d 96, 406 N.E.2d 1121, 1125–1127 (1980); *Hostetler v. Kennedy,* 69 Ohio App.3d 299, 590 N.E.2d 793, 794 (1990); *Mayer v. Mayer,* 91 Wis.2d 342, 283 N.W.2d 591, 596 (Ct.App.1979).

Because we conclude that the district court had personal jurisdiction over Joseph, the issue is not presented in this case.

4(b)(2), N.D.R.Civ.P., we need not reach this question.

The trial court concluded that it had personal jurisdiction over Joseph under the long-arm provisions of Rule 4(b)(2), N.D.R.Civ.P., because Joseph had sufficient contacts with the state. The relevant provisions are Rule 4(b)(2)(H) and (I):

"*(b) Jurisdiction Over Person.*

\*　　\*　　\*　　\*　　\*　　\*

"(2) *Personal Jurisdiction Based Upon Contacts.* A court of this state may exercise personal jurisdiction over a person who acts directly or by an agent as to any claim for relief arising from the person's having such contact with this state that the exercise of personal jurisdiction over the person does not offend against traditional notions of justice or fair play or the due process of law, under one or more of the following circumstances:

\*　　\*　　\*　　\*　　\*　　\*

"(H) enjoying any other legal status or capacity within this state; or

"(I) engaging in any other activity, including cohabitation or sexual intercourse, within this state."

Rule 4(b) is intended to permit the state courts to exercise personal jurisdiction to the fullest extent permitted by due process. *United Accounts, Inc. v. Quackenbush,* 434 N.W.2d 567, 569 (N.D.1989); *Hebron Brick Co. v. Robinson Brick and Tile Co.,* 234 N.W.2d 250, 255 (N.D.1975). Questions of personal jurisdiction must be decided on a case-by-case basis depending upon the particular facts and circumstances. *Hebron Brick, supra,* 234 N.W.2d at 257.

The trial court found that Joseph had established significant contacts with North Dakota while living here which satisfied due process requirements, and that those contacts were directly related to the action for divorce and child custody. Joseph lived in North Dakota for more than two years. He was married here, fathered a child here, and spent the first year of his son's life here. North Dakota was the last state in which the family lived before Joseph's temporary assignment in Turkey, and Joseph's wife returned to live in North Dakota after leaving Turkey.

These contacts demonstrated that Joseph had cohabited in this state, had engaged in sexual intercourse in this state, and established a legal status in this state contemplated by the Rule. These contacts were significant and continuing, such that exercise of personal jurisdiction over Joseph in this case does not offend traditional notions of justice or fair play under due process. *See United Accounts, Inc. v. Quackenbush, supra,* 434 N.W.2d at 569; *Hust v. Northern Log, Inc.,* 297 N.W.2d 429, 431 (N.D.1980). Finally, this action for divorce and child custody arises directly from Joseph's contacts with the state, satisfying the relationship between the action and the contacts.[7]

We reject Joseph's attempts to diminish his contacts with North Dakota, and his mischaracterization of those contacts as "remote" and "ancient." Joseph had significant and continuing contacts with this state, which continued until July 1989. This action was commenced in August 1990. We would hardly characterize those contacts as "ancient." As for Joseph's assertion that the contacts must be current, the Rule comprehends that many contacts will arise from past conduct.

We also see no relevance in the fact that Joseph voluntarily terminated his contacts with the state. The result of such an argument would be that defendants could render themselves immune from suit in the state by merely packing up and leaving. It is not hard to imagine the chaos which would ensue in domestic relations law if one party could defeat jurisdiction merely by exiting the state before the summons is served.

---

7. Rule 4(b)(3) provides:

"(3) *Limitation on Jurisdiction Based Upon Contacts.* If jurisdiction over a person is based solely upon paragraph (2) of this subdivision, only a claim for relief arising from bases enumerated therein may be asserted against that person."

We conclude that the trial court did not err in exercising personal jurisdiction over Joseph.[8]

### III

Joseph asserts that the trial court erred in awarding custody to Shannon.

■ We recently summarized our standard of review of child custody determinations in *Freed v. Freed*, 454 N.W.2d 516, 518 (N.D.1990):

"It is well settled that a trial court's determinations on matters of child custody are treated as findings of fact.... We do not set aside the findings of the trial court on appeal unless they are clearly erroneous.... A trial court's findings of fact are presumptively correct, .. and are clearly erroneous only when the reviewing court, based upon the entire evidence, is left with a definite and firm conviction that a mistake has been made.... Our scope of review is properly limited by the 'clearly erroneous' rule because the trial court, having had the opportunity to observe the demeanor and credibility of the witnesses, is in a much better position to ascertain the true facts than an appellate court which must rely on a cold record...."

[Citations omitted.]

In addition, we will not reexamine findings of fact made by the court upon conflicting evidence, and a choice between two permissible views of the weight of the evidence is not clearly erroneous. *Romsos v. Sorben*, 474 N.W.2d 83, 84 (N.D.1991).

■ Joseph essentially argues that he is the more fit parent for Christopher, stressing evidence concerning Shannon's conduct before, during, and after the marriage. However, Joseph remains blind to his own wrongful conduct, while attempting to magnify Shannon's shortcomings. In particular, Joseph ignores his own prior history of violence during the marriage, and seems to be wholly unaware of the mental anguish caused to Shannon by his concealment of Christopher's location for an extended period of time.

The court was presented with negative evidence concerning each party's prior conduct. The court also had the benefit of testimony from three expert witnesses. Joseph's own experts agreed that either Joseph or Shannon would be a fit caretaker for Christopher, and they recommended joint custody. The court-appointed psychologist recommended that Shannon receive custody.

The trial court particularly focused upon the concealment of the child in reaching its decision on custody. This was the court's reasoning:

"In addition to the posture of the military ignoring orders of the court, Shannon was confronted with the refusal of Joe to accept service by mail from Shannon's counsel after she started her divorce action. This, coupled with the clandestine exchange of the child by Joe to his parents in England who held the child incommunicado and not disclosing that they had him, instead behaving in a manner that led one to believe that Christopher was still overseas and in good health reveals a perverse alliance to separate the boy from his mother which could continue if the child was awarded

---

8. Our resolution of this issue makes it unnecessary for us to consider whether Joseph's request for a stay under the Soldiers' and Sailors' Civil Relief Act, 50 U.S.C.App. § 521, constituted a general appearance which conferred personal jurisdiction over Joseph. The authorities are split on the issue. Cases holding that a serviceman's request for a stay constitute a general appearance include *Skates v. Stockton,* 140 Ariz. 505, 683 P.2d 304, 306 (Ct.App.1984); *Vara v. Vara,* 14 O.O.2d 261, 171 N.E.2d 384, 392 (Ct. Com.Pl.1961); *Artis–Wergin v. Artis–Wergin,* 151 Wis.2d 445, 444 N.W.2d 750, 753–754 (Ct.App. 1989); *see also In re Marriage of Thompson,* 17 Kan.App.2d 47, 832 P.2d 349, 352–353 (1992).

One commentator has noted that "requests for an extension of time, whether in the form of a stay request under section 521 or a general request for a continuance, are considered steps in the regular presentation of the case and, therefore, general appearances." Chandler, *The Impact of a Request for a Stay of Proceedings Under the Soldiers' and Sailors' Civil Relief Act,* 102 Mil.L.Rev. 169, 172–173 (1983).

Other cases indicate that a request for a stay under Section 521 does not constitute a general appearance. *See O'Neill v. O'Neill,* 515 So.2d 1208, 1212 (Miss.1987); *Kramer v. Kramer,* 668 S.W.2d 457, 458 (Tex.Ct.App.1984).

to Joe and taken out of state. Having Shannon as the custodial parent, with visitation rights granted to Joe will prevent, it is to be hoped, a reenactment of such unwarranted concealment. To be sure, there is animosity when a marriage breaks up, but to use a child as a weapon to inflict hurt, or to take harmful drastic measures unilaterally to impose ones personal child rearing philosophy to the detriment of another is impermissible."

The trial court was presented with conflicting evidence on the issue of custody and had the benefit of observing the demeanor and credibility of the parties and other witnesses. We are not left with a definite and firm conviction that a mistake has been made. We conclude that the trial court's determination on custody is not clearly erroneous.

## IV

■ Joseph asserts that the trial court erred in failing to award extended summer visitation.

At the time of trial, Joseph had returned to Minot and was pursuing a college degree. Joseph was awarded visitation every other weekend and alternating holidays as long as he resides in North Dakota. The court's memorandum opinion indicates that Joseph will receive extended summer visitation if he moves out of state.

The factual situation in this case is distinguishable from *Dschaak v. Dschaak*, 479 N.W.2d 484 (N.D.1992). In *Dschaak* we concluded that the trial court had erred in refusing, without explanation, to award extended summer visitation with a school age child and a fit noncustodial parent. In this case the child is not of school age, the court has given consideration to the request for summer visitation and has determined such visitation to be appropriate in the event the noncustodial parent should move from the state. *Dschaak* was not intended to eliminate the reasonable discretion of the trial court in these matters.

The judgment is affirmed.

ERICKSTAD, C.J., and MESCHKE and LEVINE, JJ., concur.

VANDE WALLE, Justice, concurring specially.

I write separately to note that we do not decide in this case whether child-custody actions are in rem proceedings or in personam proceedings. Child custody was not an issue in *Smith v. Smith*, 459 N.W.2d 785 (N.D.1990), although we reversed the North Dakota court-ordered payment of child support because there was no in personam jurisdiction of the mother or the child in that case. In *Smith* we did, however, refer to decisions from other jurisdictions which hold that in personam jurisdiction of a non-resident spouse is necessary in order to validly adjudicate rights to child custody. *See In re Marriage of Passiales*, 144 Ill.App.3d 629, 98 Ill.Dec. 419, 494 N.E.2d 541 (1986); *Simpson v. O'Donnell*, 98 Nev. 516, 654 P.2d 1020 (1982).

These decisions do not discuss the UCCJA and are not cited in footnote 6 of the majority opinion. Presumably, however, they are predicated on a constitutional due-process standard rather than a statutory basis since both Illinois (Ill.Rev.Stat. ch. 40, § 2101 to 2126) and Nevada (Nev.Rev. Stat. §§ 125 A.010 to 125 A.250) have enacted the UCCJA. Therefore, there are considerations other than the UCCJA in determining the jurisdiction of the court to adjudicate the rights to child custody when a non-resident spouse and child are involved. As noted in the majority opinion, because we conclude the trial court had in personam jurisdiction of Joseph under Rule 4(b)(2) N.D.R.Civ.P., we do not decide the issue of the necessity of in personam jurisdiction over a non-resident spouse in order to award child custody.

I concur in the result reached by the majority opinion.